1  Agnieszka M. Fryszman [DC Bar No. 459208]
   *pro hac vice*
2  Nicholas J. Jacques [DC Bar No. 1673121]
   *pro hac vice*
3  **COHEN MILSTEIN SELLERS & TOLL PLLC**
   1100 New York Ave. NW, Suite 800
4  Washington, DC 20005
   202-408-4600
5
6  Paul L. Hoffman [CA Bar No. 071244]
   **SCHONBRUN SEPLOW HARRIS**
7  **HOFFMAN & ZELDES, LLP**
   200 Pier Ave., Suite 226
8  Hermosa Beach, CA 90254
   424-297-0114
9  *Attorneys for Plaintiffs*

10 *[Additional Counsel Continued on Next Page]*

11

12

13              **UNITED STATES DISTRICT COURT**

14              **SOUTHERN DISTRICT OF CALIFORNIA**

15

16 | Akhmad, Angga, Muhammad Sahrudin, and Muhammad Syafi'i, | Case No.:  3:25-cv-00583-MMA-DEB |
   Plaintiff,

17                                    **PLAINTIFFS' MEMORANDUM IN**
                                      **OPPOSITION TO DEFENDANT'S**
18 v.                                 **MOTION TO DISMISS**

19 BUMBLE BEE FOODS, LLC             *[NO ORAL ARGUMENT PURSUANT*
20 280 10th Avenue,                   *TO LOCAL RULE]*
   San Diego, CA 92101
21                                    Date: September 5, 2025
                      Defendant.     Judge: Hon. Michael M. Anello
22                                    Courtroom: 3C

23

24                                    Action Filed: March 12, 2025

25

26

27

28

*[Additional Counsel Cont. from previous page]*

Helen I. Zeldes [CA Bar No. 220051]
**SCHONBRUN SEPLOW HARRIS**
**HOFFMAN & ZELDES, LLP**
501 W. Broadway, Suite 800
San Diego, CA 92101
619-400-4990

Asia Arminio |DC Bar No. 996077|
*pro hac vice*
**GREENPEACE, INC.**
1300 Eye Street NW, Suite 1100
Washington, DC 20005
202-462-1177

# <u>TABLE OF CONTENTS</u>

LEGAL STANDARD ............................................................................................ 2

BACKGROUND ................................................................................................. 2

ARGUMENT ...................................................................................................... 4

    I.      PLAINTIFFS STATE A TVPRA CLAIM ...................................... 4

          A.     Plaintiffs Plausibly Allege Knowledge ................................ 5

          B.     Plaintiffs Plausibly Allege "Participation in a Venture" ...................... 9

          C.     The TVPRA Civil Remedy Applies Here ............................ 15

               1.     The TVPRA civil remedy is expressly extraterritorial ............ 16

               2.     Plaintiffs allege an 18 U.S.C. § 1589(b) violation in the United States .............................................................. 20

    II.     PLAINTIFFS HAVE STANDING FOR INJUNCTIVE RELIEF .............. 21

    III.    PLAINTIFFS STATE A NEGLIGENCE CLAIM ....................... 23

    IV.    LEAVE TO AMEND ....................................................... 25

    V.     CONCLUSION ............................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abafita v. Aldukhan,*
 2019 WL6735148 (S.D.N.Y Apr. 4, 2019) ........................................................17

*Abernathy v. Carlyle Grp.,*
 2024 WL 5331993 (D.D.C. Sept. 27, 2024).................................................17, 19

*Adhikari v. KBR Inc.,*
 2017 WL 4237923 (S.D. Tex. Sept. 25, 2017)...................................................24

*Adhikari v. Kellogg Brown & Root, Inc.,*
 845 F.3d 184 (5th Cir. 2017) ..........................................16, 18, 19, 25

*Aguero v. Esnoz,*
 2024 WL 519786 (E.D. Cal. Feb. 9, 2024) ..........................................................8

*Aguilera v. Aegis Commc'ns Grp., LLC,*
 72 F. Supp. 3d 975 (W.D. Mo. 2014)................................................................17

*Aragon v. Che Ku,*
 277 F.Supp.3d 1055 (D. Minn. 2017)................................................................14

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009)............................................................................................2

*Bell Atl. Corp. v. Twombly,*
 550 U.S. 544 (2007)............................................................................................2

*Berson v. Applied Signal Tech., Inc.,*
 527 F.3d 982 (9th Cir. 2008) ..............................................................................7

*Bistline v. Parker,*
 918 F.3d 849 (10th Cir. 2019) ..........................................................................21

*Bode v. City of Fullerton,*
 815 F. Supp. 2d 1117 (C.D. Cal. 2011) ..............................................................7

*Broam v. Bogan,*
 320 F.3d 1023 (9th Cir. 2003) ..........................................................................25

*Brown v. USA Taekwondo*,
  253 Cal. Rptr. 3d 708 (Cal. Ct. App. 2019)........................................25

*C.C. v. Rashid*,
  2024 WL 5200543 (D. Nev. Dec. 20, 2024) ......................................10

*Davidson v. Kimberly-Clark Corp.*,
  889 F.3d 956 (9th Cir. 2018) ...............................................................22

*Diaz v. Tesla, Inc.*,
  598 F.Supp.3d 809 (N.D. Cal. 2022)......................................................7

*Doe #1 v. Red Roof Inns, Inc.*,
  21 F.4th 714 (11th Cir. 2021) ...............................................................10

*Doe 1 v. Apple Inc.*,
  96 F.4th 403 (D.C. Cir. 2024)........................................................10, 15

*Doe 1 v. Deutsche Bank Aktiengesellschaft*,
  671 F. Supp. 3d 387 (S.D.N.Y. 2023) ...............................................9, 24

*Doe (A.L.G.) v. Wyndham Hotel & Resorts, Inc.*,
  2024 WL 5371983 (W.D. Tex. Nov. 21, 2024)......................................9

*Doe (S.A.S.) v. ESA P Portfolio LLC*,
  2024 WL 3276417 (W.D. Wash. July 2, 2024).......................................7

*Doe v. Hotels*,
  2024 WL 2955728 (M.D. Fla. June 12, 2024) ........................................7

*Doe v. Wyndham Hotels & Resorts*,
  2025 WL 85831 (E.D. Cal. Jan. 7, 2025) ................................................9

*Doe v. Wyndham Hotels & Resorts, Inc.*,
  2025 WL 1119736 (C.D. Cal. Mar. 5, 2025).........................................10

*Doe v. Wyndham Hotels & Resorts, Inc.*,
  2025 WL 824369 (S.D. Cal. Mar. 14, 2025).....................................10, 14

*Eminence Cap., LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) .............................................................25

*F.C. v. Jacobs Sols.*,
  2025 WL 1766069 (D.Colo. June 26, 2025) .......................8, 9, 10, 17

*U.S. ex rel. Fadlalla* v. *DynCorp Int'l LLC*,
    402 F.Supp.3d 162 (D. Md. 2019) ...................................................................17, 21

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ..........................................................................................5

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
    82 F.4th 664 (9th Cir. 2023) ........................................................................21, 22

*Franklin v. Scribner*,
    2011 WL 1311743 (S.D. Cal. Apr. 4, 2011) .......................................................22

*G.G v. Salesforce.com, Inc.*,
    76 F.4th 544 (7th Cir. 2023) ...................................................................*passim*

*Gilbert v. U.S. Olympic Comm.*,
    423 F. Supp. 3d 1112 (D. Colo. 2019) ................................................................21

*H.H. v. G6 Hosp.*,
    2019 WL 6682152 (S.D. Ohio Dec. 6, 2019) ........................................................5

*Hacala v. Bird Rides, Inc.*,
    306 Cal. Rptr. 3d 900 (Cal. App. 2023) ...............................................................24

*Hardeman v. Monsanto Co.*,
    997 F.3d 941 (9th Cir. 2021) .............................................................................7

*U.S. ex rel. Hawkins v. ManTech Int'l Corp.*,
    752 F. Supp. 3d 118 (D.D.C. 2024) ....................................................................19

*Hernandez v. Jensen*,
    276 Cal. Rptr. 3d 281 (Cal. App. 2021) ...............................................................24

*Kesner v. Super. Ct.*,
    384 P.3d 283 (Cal. 2016) ..................................................................................23

*Khoja v. Orexigen Therapeutics, Inc.*,
    498 F. Supp.3d 1296 (S.D. Cal, 2020) .................................................................22

*Kiobel v. Royal Dutch Petroleum Co.*,
    133 S. Ct. 1659 (2013) .....................................................................................19

*Lesnik v. Eisenmann SE*,
    374 F.Supp.3d 923 (N.D. Cal. 2019) .............................................................10, 15

*Lugtu v. Calif. Highway Patrol*,
  28 P.3d 249 (Cal. 2001) ................................................................................23, 24

*M. L. v. Craigslist*,
  2020 WL 5494903 (W.D. Wash. Sept. 11, 2020) ...............................................9

*M.A. v. Wyndham Hotels & Resorts, Inc.*,
  425 F. Supp. 3d 959 (S.D. Ohio 2019) ...........................................................8, 14

*Marjolejo-Campos v. Holder*,
  558 F.3d 903 (9th Cir 2009) ...............................................................................5

*Maslic v. ISM Vuzem d.o.o.*,
  2021 WL 5415261 (N.D. Cal. Nov. 19, 2021) ...........................................10, 15

*Maya v. Centex Corp.*,
  658 F.3d 1060 (9th Cir. 2011) .............................................................................2

*Mia v. Kimberly-Clark*,
  2025 WL 752564 (D.D.C Mar. 10, 2025) ............................................................9

*Michael R. v. Jeffrey B.*,
  205 Cal. Rptr. 312 (Cal. Ct. App. 1984).............................................................23

*Nestle USA, Inc. v. Doe*,
  593 U.S. 628 (2001).............................................................................................20

*Nestle USA, Inc. v. Doe*,
  Nos. 19-416, 19-453 (2020),2020 WL 6322316 ...............................................20

*U.S. ex rel. Osinek v. Permanente Med. Grp., Inc.*,
  640 F. Supp. 3d 885 (N.D. Cal. 2022).................................................................7

*Paguirigan v. Prompt Nursing Emp. Agency LLC*,
  286 F. Supp. 3d 430 (E.D.N.Y. 2017)................................................................21

*Pamela L. v. Farmer*,
  169 Cal. Rptr. 282 (Cal. App. 1980)...................................................................24

*Peace Ranch, LLC v. Bonta*,
  93 F.4th 482 (9th Cir. 2024) ................................................................................2

*Pierce v. NovaStar Mortg., Inc.*,
  422 F. Supp. 2d 1230 (W.D. Wash. 2006) ..........................................................5

*Plaintiff A v. Schair*,
2014 WL 12495639 (N.D. Ga. Sept. 9, 2014)....................................................17

*Ratha v. Phatthana*,
2016 WL 11020222 (C.D. Cal. Nov. 9, 2016) ............................................16, 17

*Ratha v. Phatthana Seafood Co.*,
35 F.4th 1159 (9th Cir. 2022) ......................................................................8, 9

*Ricchio v. McLean*,
853 F.3d 553 (1st Cir. 2017) (Souter, J.)............................................................10

*Richardson v. Kier*,
37 Cal. 263 (1869) ......................................................................................22, 23

*Rodriguez v. Pan Am. Health Org.*,
29 F.4th 706 (D.C. Cir. 2022)......................................................................20, 21

*Roe v. Howard*,
917 F.3d 229 (4th Cir. 2019) ................................................................16, 18, 20

*S.F. Herring Assoc. v. PG&E*,
2019 WL 11073502 (N.D. Cal. Jul. 26, 2019) ...................................................22

*Seattle Pac. Univ. v. Ferguson*,
104 F.4th 50 (9th Cir. 2024) ................................................................................22

*Sherman v. Trinity Teen Sols.*,
84 F.4th 1182 (10th Cir. 2023) ...........................................................................21

*Sims v. City of Seattle*,
2023 WL 3619019 (W.D. Wash. May 24, 2023) ...............................................22

*U.S. v. Arbelaez*,
719 F.2d 1453 (9th Cir. 1983) ............................................................................15

*U.S. v. Barai*,
55 F.4th 1245 (9th Cir. 2022) .............................................................................14

*U.S. v. Baston*,
818 F.3d 651 (11th Cir. 2016) ............................................................................16

*U.S. v. Majeed*,
2024 WL 992884 (D. Kan. Mar. 6, 2024) ..........................................................14

*United Klans of Am. v. McGovern*,
    621 F.2d 152 (5th Cir. 1980) ...................................................................7

*Volk v. D.A. Davidson & Co.*,
    816 F.2d 1406 (9th Cir. 1987) .................................................................5

*Weirum v. RKO Gen., Inc.*,
    539 P.2d 36 (Cal. 1975) .........................................................................23

*Zetz v. Bos. Sci. Corp.*,
    644 F. Supp. 3d 684 (E.D. Cal. 2022) ...................................................7

**Statutes**

18 U.S.C. § 1589 .............................................................................*passim*

18 U.S.C. § 1595 .............................................................................*passim*

Cal. Civ. Code § 3422 (West, Westlaw through 2025 Ch. 45 of Reg. Sess.) .........22

Pub. L. No. 108-193, § 4(a)(4)(A), 117 Stat. 2875, 2878 (2003) ...........................16

Pub. L. No. 109-164, §103(a), 119 Stat. 3558, 3562 (2005) .................................16

Pub. L. No. 110-457, §§ 222, 223(a), 122 Stat. 5044, 5067- 71 (2008)................16

**Other Authorities**

Fed. R. Civ. P. 9 .....................................................................................5

Fed. R. Civ. P. 15 .................................................................................25

Black's Law Dictionary (12th ed. 2024) ................................................22

Restatement (Second) of Torts................................................................23

1      Plaintiffs, victims of forced labor at sea, bring two claims against Bumble Bee for
2 knowingly benefitting from its participation in a venture with Chinese vessel owners – its
3 "trusted network" of suppliers – and its parent company, FCF, to harvest, process and
4 import tuna into the United States for sale to American consumers. Bumble Bee did so
5 despite its knowledge that the venture engaged in forced labor.

6      First, Plaintiffs bring a claim under 18 U.S.C. § 1589(b), a provision Defendant's
7 brief largely ignores, and § 1595. Congress has repeatedly expanded the Trafficking
8 Victims Protection Act (TVPRA) to ensure it provides a meaningful tool to combat human
9 trafficking and forced labor. Among the tools Congress created was a civil remedy targeted
10 at persons, including corporations, who benefit from participation in a venture engaged in
11 forced labor, debt bondage, or other abuses. Congress did so because making forced labor
12 less profitable reduces the incentives to engage in this abuse.

13      Plaintiffs meet all the TVPRA statutory requirements. Plaintiffs allege the required
14 mens rea: that Bumble Bee knew, recklessly disregarded and/or should have known that it
15 was sourcing tuna from vessels engaged in obtaining labor by force, physical restraint, and
16 other means. Bumble Bee received reports over a decade focused specifically on the vessels
17 that supply tuna to Bumble Bee – reports that highlighted the specific abuses suffered by
18 Plaintiffs here – and was aware of U.S. law enforcement action finding forced labor on a
19 Bumble Bee supplier vessel. Plaintiffs' allegations also satisfy § 1589(b)'s "participation
20 in a venture" element. Plaintiffs adequately pled multiple alternative ventures involving
21 Bumble Bee, FCF, and the vessel owners. Plaintiffs also adequately alleged that Bumble
22 Bee participated in the ventures, long-term partnerships managed by Bumble Bee in
23 collaboration with its corporate parent that had a common goal, shared profits and risk, and
24 for which Bumble Bee provided direct, targeted support. Finally, no court in this
25 jurisdiction and no court of appeals has agreed with Defendant's argument on
26 extraterritoriality, which relies on one outlier, out-of-circuit decision currently on appeal.
27 Moreover, because Bumble Bee benefitted in the United States, application of the TVPRA
28 in this case is not extraterritorial at all.

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
Case No.: 3:25-cv-00583-MMA-DEB

Second, Plaintiffs bring claims under California negligence law. Plaintiffs have standing under traditional tort law principles for their request for injunctive relief. And Plaintiffs allege, consistent with California law, that Bumble Bee's actions created a foreseeable risk of harm to Plaintiffs.

Bumble Bee's motion should be denied.

## LEGAL STANDARD

A complaint need only contain enough facts to state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In deciding a Rule 12(b)(6) motion to dismiss, a court must accept plaintiffs' factual allegations as true and draw all reasonable inferences in plaintiffs' favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

On a Rule 12(b)(1) motion that asserts a lack of standing, the court likewise limits its analysis to the allegations in the complaint, which it accepts as true. *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487-88 (9th Cir. 2024). Although a plaintiff may not rely on a "bare legal conclusion," the *Twombly* and *Iqbal* plausibility standards do not apply. *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011). "[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

## BACKGROUND

Bumble Bee does not dispute that the Plaintiffs adequately alleged that they were victims of forced labor. Plaintiffs allege they were put to work on vessels that are part of Bumble Bee's "trusted network" of longline fishing vessels, part of a long-term venture designed and operated to maximize profits of goods sold in the United States. Compl., Dkt 1, ¶4. The vessel captains subjected the men to physical abuse and violence, deprived them of adequate food, and denied them medical care (and put them back to work) even when the men were seriously injured. *Id.* ¶¶5, 8-11, 99-104, 112-118, 125-130, 134-144. Because Bumble Bee utilized transshipment – collecting catch and resupplying at sea – the vessels did not return to port. *Id.* ¶¶4, 30-32, 62-63, 174-183. The men asked repeatedly to leave, even banding together in work stoppages, but the vessel staff refused to let them leave even

when a transshipment ship was available. *Id*. ¶¶5,105, 117-118, 129-130, 141-143. Due to debt bondage, including fees, deductions and penalties charged by the vessels, the men were left with little to no wages for their months of hard, around the clock labor. *Id*. ¶¶5, 98-99, 106, 109-111, 119, 124, 126, 131, 133, 141.

Bumble Bee is 100% owned by FCF, a Taiwanese corporation, with which it shares executives and financing. *Id*. ¶¶152, 149, 156-158. Bumble Bee and FCF collaborate to source, process, and import tuna into the United States for sale to U.S. consumers. *Id*. ¶¶149-251. Bumble Bee sources almost all (95% to 100%) of its albacore through FCF and a "trusted network" of vessels with which it has a long-term, ongoing relationship. *Id*. ¶¶151, 167-215. Many of the vessels in Bumble Bee's "trusted network," including each of the vessels on which Plaintiffs were forced to work, fish exclusively for Bumble Bee. *Id*. ¶¶206, 215, 224, 234, 237.

Bumble Bee, FCF, and the vessel owners have partnered in two Fishery Improvement Projects ("FIPs"), which require ongoing close collaboration and control. *Id*. ¶¶217-238. As part of these FIPs, Bumble Bee sets and enforces fishing practices, which the participating vessels are required to abide by. *Id*. ¶¶225-26. For example, Bumble Bee set policies on the use of bird-scaring lines, logbooks to track bycatch, and garbage-management plans. *Id*. ¶226. Bumble Bee conducts trainings, inspections, and audits to ensure compliance. *Id*. ¶¶227-231. All members of the FIP invest money, time, and effort in making it succeed. *Id*. ¶220. Each of the vessels on which Plaintiffs were forced to work were members of one of Bumble Bee's FIPs and subject to the FIP's policies and procedures, as set and enforced by Bumble Bee. *Id*. ¶¶233-238. One of the practices utilized by Bumble Bee is transshipment. Despite criticism that transshipment facilitates forced labor and while other large seafood companies have backed away from the practice, *id*. ¶¶83, 241-44, Bumble Bee continues to utilize transshipment services for the vessels in its network and in the FIP. *Id*. ¶¶161, 176-82.

Bumble Bee discusses the tuna supply chain at length and concedes, Def.'s Mem. at 4, that "forced labor in the distant-water fishing industry is a decades-old problem."

Bumble Bee also states that after the Complaint was filed, it "promptly" stopped purchasing from the vessels at issue. *Id.* at 1. But Bumble Bee has known for years that its suppliers use forced labor. Dating back to at least 2016, non-governmental organizations, including Greenpeace organizations, issued reports specifically highlighting the presence of forced labor in Bumble Bee's "trusted network" of longline fishing vessels. Compl. ¶¶78-95. Greenpeace sent these reports to Bumble Bee executives, who acknowledged receipt. *Id.* ¶¶80, 82, 84, 86-88, 90; *see also id.* ¶¶64, 93-95.

The U.S. Government, the International Labour Organization, and various nongovernmental organizations and major media outlets have highlighted the problem of forced labor in the distant water fishing industry, particularly on longline tuna vessels that rely on migrant fishers. *Id.* ¶¶36-95. The reports highlighted the indicia of forced labor, abuses that match the Plaintiffs' experiences. *E.g.*, *id.* ¶¶56-57, 62-63, 69, 72. The reports also specifically highlighted Chinese-owned vessels as significant offenders in the use of forced labor and Indonesian crewmembers as particularly vulnerable. *E.g.*, *id.* ¶¶43-50, 55-57, 67, 75-77.

Bumble Bee's own self-evaluation admitted that the risk factors were present in its fleet. *Id.* ¶250 (admitting use of transshipment, high percentage of migrant workers, and fishers not allowed on shore leave at least once every 90 days). Indeed, Bumble Bee settled a false advertising lawsuit by agreeing it would refrain from claiming that it had a "fair and safe supply chain" and that its tuna was produced with "fair and responsible working conditions." *Id.* ¶92.

## ARGUMENT

## I.    PLAINTIFFS STATE A TVPRA CLAIM

Plaintiffs state a claim under 18 U.S.C. § 1589(b) and § 1595. Bumble Bee does not challenge that Plaintiffs adequately alleged that they were victims of forced labor and that it knowingly benefitted. Instead, Bumble Bee argues that Plaintiffs' "knowledge" and "participation in a venture" allegations are not plausible and that, contrary to the vast majority of authority, the TVPRA civil remedy does not apply.

A.    Plaintiffs Plausibly Allege Knowledge

Plaintiffs allege that Bumble Bee knew, recklessly disregarded and/or should have known that it was sourcing tuna from vessels engaged in obtaining labor through force, serious harm, physical restraint, and other means described in 18 U.S.C. § 1589(a), as required by §§ 1589(b) and 1595(a). Compl. ¶¶254-257.[1] Plaintiffs cite decades of reporting specifically focused on the vessels that supply tuna to Bumble Bee – reporting that highlighted the same abuses as suffered by Plaintiffs -- as well as law enforcement actions involving a Bumble Bee supplier. Compl. ¶¶78-88; *see also id*. ¶¶45-77(additional reports by U.S. government, non-governmental organizations, and media). Bumble Bee received and responded to these reports. *Id*. ¶¶64, 80, 84, 86. Plaintiffs do not rest their claims on the type of general country or industry reports criticized by Bumble Bee.

First, the extent of Bumble Bee's knowledge is not suited to resolution on a motion to dismiss, particularly as a defendant's own knowledge of forced labor abuses is a fact exclusively within their knowledge and control. *E.g. Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1417 (9th Cir. 1987); *H.H. v. G6 Hosp.*, 2019 WL 6682152, at *5 n.2 (S.D. Ohio Dec. 6, 2019) (defendant's knowledge of trafficking venture "will be resolved in discovery and do not warrant dismissal"); *Pierce v. NovaStar Mortg., Inc.*, 422 F. Supp. 2d 1230, 1237 (W.D. Wash. 2006) (question of knowledge "does not belong" in motion to dismiss).

Second, knowledge may be alleged generally. Fed. R. Civ. P. 9(b). Plaintiffs' general allegations are plausible as Plaintiffs also allege that well before Plaintiffs' forced labor, Greenpeace organizations reported on forced labor specifically on vessels supplying Bumble Bee and sent these reports to Bumble Bee executives, who acknowledged

---

[1] The TVPRA "knew or should have known" standard is a negligence standard. *G.G v. Salesforce.com, Inc.*, 76 F.4th 544, 555 n.9 (7th Cir. 2023); *see also Marjolejo-Campos v. Holder*, 558 F.3d 903, 912 (9th Cir 2009). The civil "knew or recklessly disregarded" standard is similar. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994) (civil "reckless" is acting or failing to act in face of risk "that is either known or so obvious that it should be known"). Defendant did not address the "reckless disregard" standard.

receiving them. *Id.* ¶¶79-84, 90. These reports described physical violence, excessive overtime, inadequate food, denial of medical care, recruitment debts, wage deductions, and other abuses that kept the fishers in forced labor on Bumble Bee supply ships, *id.*, -- the same abuses as alleged here. Indeed, the reports identified the conditions as internationally recognized indicators of forced labor. *Id.* ¶¶80, 83, 90; *see also id.* ¶¶37-39, 47 (describing "red flags" for forced labor identified by State Department). In addition to the published reports specifically about Bumble Bee suppliers, in 2020, U.S. Customs and Border Protection found that a Bumble Bee supplier was harvesting tuna using forced labor and prohibited its entry into the United States. *Id.* ¶¶51-54 (citing physical violence, debt bondage and abusive conditions), 85-88. Bumble Bee was aware of the CBP finding. *Id.* at 86; *see also id.* ¶80 (criminal charges against recruiter).

The law enforcement activity and specific reports of forced labor in Bumble Bee's "trusted network" are buttressed by decades of reporting by the U.S. government and NGOs on the pervasiveness of forced labor in distant-water fishing, on Indonesia as a source country for rural men exploited in the fishing industry, that owners of Chinese fishing fleets rely on forced labor, and that longline vessels in particular, which are labor intensive, are rife with forced labor. *Id.* ¶¶26, 36-77; *see also* ¶¶55-56 (U.S. Maritime SAFE Act report on forced labor on Chinese-owned fishing vessels). Multiple reports also highlighted the use of transshipment as a risk factor for forced labor. *Id.* ¶¶31, 62-63. Greenpeace sent its report to Bumble Bee's CEO, who replied, "It is not high on my priority list." *Id.* ¶64. In a "Self-Evaluation of Risk Criteria" related to forced labor and compiled as part of its FIP, Bumble Bee acknowledged the existence of each of three risk criteria: transshipment, significant migrant workforce, and "fishers not allowed on shore leave." *Id.* ¶250. Bumble Bee also reported it was "not sure" whether its vessels had committed forced labor within the past four years. *Id.* ¶251; *see also* ¶246 (COO resigns, in part because of awareness of forced labor). To settle a consumer protection lawsuit, Bumble Bee agreed it would no longer market its tuna produces as being produced through a "fair and safe supply chain" and with "fair and responsible working conditions." *Id.* ¶249.

These specific reports about Bumble Bee's fleet, law enforcement activity, and self-assessments put Bumble Bee on notice such that it knew, should have known, and/or recklessly disregarded the abuses taking place on the vessels in its tuna harvesting venture, vessels that were part of its "trusted network." *See Hardeman v. Monsanto Co.*, 997 F.3d 941, 973 (9th Cir. 2021) ("failing to fully assess Roundup's safety after being alerted to possible risks" is sufficient evidence that defendant acted with "reckless disregard"); *Salesforce.com*, 76 F.4th at 555 (Salesforce should have known about Backpage's involvement in sex trafficking based on news coverage and law enforcement actions); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008) ("absurd to suggest" that company officers would be unaware of stop-work orders affecting company's main revenue source); *United Klans of Am. v. McGovern*, 621 F.2d 152, 154 (5th Cir. 1980); *Doe (S.A.S.) v. ESA P Portfolio LLC*, 2024 WL 3276417, at *8 (W.D. Wash. July 2, 2024) (defendant had constructive knowledge of venture's TVPRA violations based on "red flags"); *Zetz v. Bos. Sci. Corp.*, 644 F. Supp. 3d 684, 723 (E.D. Cal. 2022) (jury could find recklessness where defendant had knowledge of risk but failed to take remedial steps); *U.S. ex rel. Osinek v. Permanente Med. Grp., Inc.*, 640 F. Supp. 3d 885, 903 (N.D. Cal. 2022); *Diaz v. Tesla, Inc.*, 598 F.Supp.3d 809, 842-43 (N.D. Cal. 2022) ("responses to the written complaints were so inadequate as to imply indifference"); *Bode v. City of Fullerton*, 815 F. Supp. 2d 1117, 1121 (C.D. Cal. 2011) ("sheer volume of incidents" sufficient to raise triable issue whether municipality should have known).

In addition, Plaintiffs allege that Bumble Bee closely monitors its longline tuna suppliers for compliance with labor standards. Compl. ¶¶186, 193; *see Doe v. Hotels*, 2024 WL 2955728, at *9 (M.D. Fla. June 12, 2024), *reconsideration denied sub nom. Jane Doe K.R. v. Choice Hotels*, 2024 WL 4373374 (M.D. Fla. Oct. 2, 2024) (plaintiffs sufficiently plead knowledge based on allegations that defendant "monitored and audited" hotels "for compliance with" anti-trafficking policies). Additionally, Plaintiffs allege that Bumble Bee continued to rely on transshipment even after other large seafood producers have backed away from the practice due to its association with forced labor. Compl. ¶¶243-44; *see L.M.*,

2024 WL 4204906 at *6 (plaintiffs sufficiently plead constructive knowledge by alleging that Hilton "relied upon ineffective anti-trafficking policies even once they were shown to have led to trafficking").

Bumble Bee's contrary argument relies primarily on *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159 (9th Cir. 2022), but *Ratha* does not support Bumble Bee here as it is a summary judgment decision that nonetheless found that the U.S. defendants knew of the forced labor after a specific newspaper report. The allegations in *Ratha* were sufficient at the motion to dismiss stage. *See A.B. v. Marriott Int'l*, Inc., 455 F. Supp. 3d 171, 193 (E.D. Pa. 2020) (declining to apply *Ratha* because Ratha "applied summary judgment standards with the benefit of discovery, not at the motion to dismiss stage" and "entered summary judgment in favor of the defendant because the ***evidence*** under the Rule 56 standard did not support plaintiffs' claims. We are not addressing a motion for summary judgment.") (emphasis in original). Moreover, although *Ratha* found that early, general country condition reports were insufficient to show knowledge about the factories in the venture, it also concluded that the two U.S. defendants were "undisputedly" aware of the abuses due to a more specific February 2012 newspaper report. *Ratha*, 35 F.4th at 1177, 1180 ("Wales admits it received a copy of the article describing Ratha's allegations"). Here, Plaintiffs do far more than point to general reports. Plaintiffs allege that Bumble Bee was aware of multiple *specific* instances of forced labor within the company's "trusted network" of vessel owners, was aware of the multiple risk factors and red flags present in its fleet, and that Bumble Bee had acknowledged the risks. *See F.C. v. Jacobs Sols.*, 2025 WL 1766069, *21 (D.Colo. June 26, 2025); *Aguero v. Esnoz*, 2024 WL 519786, at *4 (E.D. Cal. Feb. 9, 2024) (distinguishing *Ratha* and finding other shepherd's complaints about farm "suffice at this early stage" to put non-profit on notice); *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 968 (S.D. Ohio 2019) (defendants generally on notice of prevalent sex trafficking at their hotels and failed to take adequate steps). Moreover, *Ratha* criticized reliance on general reports that "d[id] not identify any Thai companies, much less Phatthana, as a bad actor engaged in labor abuses[.]" *Id.* at 1178. Here, in contrast to the

general reports in *Ratha*, Greenpeace reports specifically identified Bumble Bee and the vessels that supplied it. Compl. ¶¶78-84, 89-95.[2]

Bumble Bee argues that Plaintiffs cannot rely on reports about other vessels or other victims. Def.'s Mem. at 12, 14. But the TVPRA's text requires knowledge that the venture had engaged in prohibited conduct (e.g., obtaining labor by threats), not knowledge about a particular victim or specific workplace. If Congress wanted to require proof that a defendant was aware of reports of forced labor in the plaintiff's particular workplace, "it could have simply said so." *Salesforce.com*, 76 F.4th at 556. Such a restrictive interpretation would undermine the TVPRA's remedial scheme: a company could know that forced labor was endemic throughout the relevant venture but avoid liability by burying its head in the sand with respect to a particular workplace or set of workers. "Nothing in the statutory text requires such an odd result." *Id.* at 557. The vast majority of courts to consider this issue have concluded that the TVPRA does not require awareness of a specific victim or particular workplace. *Salesforce.com*, 76 F.4th at 558; *see also id.* at 558 n.13 (collecting cases); *Jacob Sols.*, 2025 WL 1766069 at *21; *Doe v. Wyndham Hotels & Resorts*, 2025 WL 85831, at *11 (E.D. Cal. Jan. 7, 2025); *Doe (A.L.G.) v. Wyndham Hotel & Resorts, Inc.*, 2024 WL 5371983, at *4 (W.D. Tex. Nov. 21, 2024); *Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387, 407 (S.D.N.Y. 2023); *M. L. v. Craigslist*, 2020 WL 5494903, at *6 (W.D. Wash. Sept. 11, 2020).

## B.    Plaintiffs Plausibly Allege "Participation in a Venture"

Plaintiffs' allegations satisfy § 1589(b)'s "participation in a venture" element. The Ninth Circuit has not passed on its meaning, but other courts of appeal have coalesced

---

[2]    Defendant's other authority is inapposite. In *Mia v. Kimberly-Clark*, 2025 WL 752564 (D.D.C Mar. 10, 2025), the reporting concerned manufacturers other than Kimberly-Clark's supplier, failed to specify the time period, and the cited audits failed to support plaintiffs' claims. The cited hotel chain cases, Def.'s Mem. at 11-12, found that "abstract awareness" of sex trafficking at hotel properties "across the United States" without more was insufficient and that the specific facts pled could support claims against the hotel, but not the corporate parent, without showing how the parent was aware of those facts.  Here, Plaintiffs allege Bumble Bee received the relevant reports. *Supra* pp.5-6.

around the plain dictionary meaning. *See Doe 1 v. Apple Inc.*, 96 F.4th 403, 414-15 (D.C. Cir. 2024); *Salesforce.com*, 76 F. 4th at 559; *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 725 (11th Cir. 2021). Thus, both parties agree that "[a] 'venture' is an 'undertaking that is dangerous, daring, or of uncertain outcome,' or a 'business enterprise involving some risk in expectation of gain.'" *Apple*, 96 F.4th at 414-15 (quoting The Am. Heritage Dictionary of the English Language (4th ed. 2000)). "'Participation' means 'taking part or sharing in something.'" *Id.* at 415 (quoting Am. Heritage Dictionary, *supra*). Courts have found that a defendant participates in a venture when, for example, he shares "a common purpose" or a desire to promote the venture's success; or shares profits and risk; or has shared ownership; or exercises control over some aspect of the venture; or maintains a "continuous business relationship"; or designs targeted solutions to meet operational needs; or provides direct, tailored, ongoing support to the venture. *Id.* at 415-16; *see also Salesforce.com*, 76 F.4th at 560 ("To survive a motion to dismiss, all that is necessary is for a plaintiff to allege such a 'continuous business relationship…'"); *Ricchio v. McLean*, 853 F.3d 553, 556 (1st Cir. 2017) (Souter, J.); *Jacob Sols.*, 2025 WL 1766069 at *16-17; *Doe v. Wyndham Hotels & Resorts, Inc.*, 2025 WL 824369, at *7 (S.D. Cal. Mar. 14, 2025) (participation in a venture satisfied by "showing a continuous business relationship"); *Doe v. Wyndham Hotels & Resorts, Inc.*, 2025 WL 1119736, at *5 (C.D. Cal.  Mar. 5, 2025) (finding participation in venture where franchisor controlled room rentals, oversaw hotel's operations, and collected data); *C.C. v. Rashid*, 2024 WL 5200543, at *10 (D. Nev. Dec. 20, 2024) (operating hotels, casinos, or businesses within hotels and casinos constitutes participation in a venture); *Maslic v. ISM Vuzem d.o.o.*, 2021 WL 5415261, at *6 (N.D. Cal. Nov. 19, 2021) (construction client, general contractor, and subcontractor all participated in venture together); *Lesnik v. Eisenmann SE*, 374 F.Supp.3d 923, 953 (N.D. Cal. 2019) (finding participation in a venture where parties "entered into an agreement" to establish paint shop and took steps to do so). A venture need not have a wrongful purpose; allegations of an ordinary commercial venture are sufficient. *E.g., Salesforce.com*, 76 F.4th at 553-54; *Lesnik*, 374 F.Supp.3d. at 953.

Here, Plaintiffs adequately pled multiple ventures involving Bumble Bee, FCF, and the vessel owners. Plaintiffs also adequately alleged that Bumble Bee participated in the ventures. The ventures rely on long-term, continuous business relationships among the participants in which the participants shared a common goal, worked together to enable the venture to succeed, and shared profits and risk. In each venture, Bumble Bee provided targeted, direct support to the vessel owners. Plaintiffs do not argue that merely "purchasing a commodity" constitutes a venture. Def.'s Mem. at 14. And as described in more detail below, the Complaint plainly alleges that the vessel owners and their captains held the Plaintiffs in forced labor.

First, Plaintiffs allege that Bumble Bee, FCF, Rongcheng City, and Rongcheng Ocean participated in a venture to harvest, process and import tuna into the United States for sale to American consumers – a classic business enterprise involving some risk in expectation of gain. *E.g.*, Compl. ¶¶147-202.

Plaintiffs also alleged that Bumble Bee participated in this venture. In their own words, Bumble Bee and its parent company described the relationship among the participants as "an integrated partnership" with "shared goals and objectives" and "common work plans" and a "longstanding partnership" with a "trusted network of boat owners." *Id.* ¶¶149-150, 169. The participants in the venture had a common purpose, shared a desire that the venture succeed, and shared risk and profits. *Id.* ¶¶171-173 (success and failure of all venture members rise and fall together), 172-73 (Bumble Bee provided a reliable, consistent buyer for the vessel owner participants and worked on expanding the market for their goods), 234 & 237 (venture vessels, including those Plaintiffs were forced to work on, caught tuna exclusively for Bumble Bee). Bumble Bee provided targeted solutions to meet operational needs as well as direct, tailored, ongoing support to the venture. *Id.* ¶¶193 (Bumble Bee reviewed vessel operations, assisted with capacity building, and instructed vessels), 195 (Bumble Bee set and monitored standards for vessels), 196-197 (Bumble Bee tracked and analysed data from vessel trips). In addition, Bumble Bee shared financing, shared high-level executives, and closely collaborated with

FCF, its corporate parent, including on strategy. *Id.* ¶¶151, 155-160, 161-166 (Bumble Bee and FCF joint agreements on tuna processing); *see also id.* ¶¶86, 158 (joint Bumble Bee and FCF response to US government action on forced labor in their supply chain). FCF provided key services that enabled the venture to flourish, including transshipment, refueling and supplying. *Id.* ¶¶175-182; *see also id.* ¶174 (FCF provided vessel building, financing, maintenance, and regulation compliance), 188-190 (FCF assisted with crew immigration logistics). Bumble Bee knew of, supported, and collaborated on these core practices. *Id.* ¶¶159-161 (Bumble Bee worked with FCF to operate a network of supply ships, transshipment vessels, and longliners), ¶192 (Bumble Bee participated in FCF's Social Responsibility Program). Bumble Bee, through its shared operations with FCF and its own initiatives, actively participates in managing the "trusted network," which it refers to as "our fleet." *Id.* ¶193. These allegations satisfy the tests courts use for participation.

Second, Plaintiffs alleged that Bumble Bee established, managed, and financed two Fishery Improvement Projects, ventures that included FCF and the respective vessel owners. *Id.* ¶¶207, 216-238. The goal of each FIP is to gain competitive advantage in the marketplace. *Id.* ¶¶218 (obtaining certification through FIP process increases price consumers are willing to pay); 219 (a FIP is "a collaboration between participants"); 220 (FIP requires an investment by participants). Thus, each FIP is a classic business enterprise involving some risk in expectation of gain.

Bumble Bee participated in both FIP ventures. Bumble Bee and the other participants had a common purpose: to harvest, process and import tuna that would be marketed to American consumers as environmentally sustainable and thereby maximize market access and profit. *Id.* ¶¶217-218. The participants shared a desire that each FIP succeed and shared risk and profits: Bumble Bee and the other participants agreed that the vessels would harvest tuna exclusively for Bumble Bee and that Bumble Bee would be the exclusive buyer of the tuna. *Id.* ¶¶224, 234, 237. Bumble Bee and the other participants also invested money, time, and effort in the respective FIP, sharing risk, and shared in the benefits, including the profits. *Id.* ¶¶172, 218-220. Bumble Bee established the FIPs in

2018, collaborating in a direct, continuous, and long-term business relationship with the other participants. *Id.* ¶¶217, 219, 224-30, 234, 236. Bumble Bee also designed targeted solutions to meet operational needs and provided direct, tailored, ongoing support to the venture. For example, Bumble Bee set and enforced fishing practices to increase the sustainability of the fishery. *Id.* ¶226 (Bumble Bee mandated specific logbooks, bird scaring lines, and garbage plans); *see also id.* ¶227 (Bumble Bee provided trainings and workshops to vessels). Bumble Bee exercised control over aspects of the venture, including over the vessels and how they operated, by requiring specific practices and enforcing those requirements. *Id.* ¶¶226-30 (Bumble Bee monitored vessels to ensure compliance with FIP requirements, including through electronic monitoring); ¶¶233-238 (FIP vessels were subject to standards and policies set by Bumble Bee); ¶¶205-214 (FIP vessels fished in same area and utilized same FCF/Bumble Bee transhippers). Finally, Bumble Bee financed and managed the FIPs. *Id.* ¶232.

In sum, the alleged ventures are classic business ventures that satisfy the dictionary definition that both parties agree applies here: a business enterprise involving some risk in expectation of gain. *Supra* pp.9-10; *see also* Def.'s Mem. at 14.

Bumble Bee's conduct satisfies the ordinary dictionary definition of "participation" that both parties agree applies here: "taking part or sharing" in something. *Supra* p.10; Def.'s Mem. at 14. Bumble Bee took part in the venture. Its conduct more than satisfies the commonly used tests for "participation" (although it only need satisfy one): the participants in each venture had a common purpose, they all worked in tandem to promote the venture's success, and they shared profits and risk. *Supra* p.10. Each venture was a continuous business relationship. *See Salesforce*, 76 F.4ᵗʰ at 560 (it is only necessary to plead a continuous business relationship). In addition, Bumble Bee provided direct, tailored and ongoing support to the venture, as well as exercised control over aspects of the venture, including over the vessels' policies and procedures and over sales.

Bumble Bee's arguments do not negate Plaintiffs' ample allegations.

First, Plaintiffs plausibly allege, and Bumble Bee does not dispute, that Plaintiffs

were forced to labor by the vessel owners. It was the vessel owners and their agents who obtained Plaintiffs' labor, physically abused and threatened Plaintiffs, deprived them of adequate sleep and food, and refused to let them go home. Compl. ¶¶99-106, 113-18, 125-29, 134-143; *see also, e.g.*, *U.S. v. Barai*, 55 F.4th 1245, 1247 (9th Cir. 2022) (upholding forced-labor conviction where victims were subject to "eighteen-hour workdays, limited food, isolation from their families, verbal and physical abuse, threats of violence, threats to call the authorities, and no pay."); *U.S. v. Majeed*, 2024 WL 992884, at *6 (D. Kan. Mar. 6, 2024) ("climate of fear . . . satisfies the means element" of § 1589(a)); *Aragon v. Che Ku*, 277 F.Supp.3d 1055, 1068-69 (D. Minn. 2017). That the vessel owners were able to exploit the vulnerability created by the Plaintiffs' debts does not diminish the vessel owners' role. And, in fact, exploitation of the fisher's indebtedness was an intentional part of the scheme. Compl. ¶¶37 (reliance on debt bondage), 47 (fees are a tool for involuntary servitude). Moreover, the existence of other culpable parties who may fall outside the venture does not undermine Bumble Bee's liability for participating in a venture with the vessel owners. For example, in *Salesforce*, the Seventh Circuit found the defendant could be liable for participating in a venture with a website used to advertise the plaintiff's exploitation, though there was no allegation the defendant participated in a venture with the street-level trafficker. 76 F.4th at 553-54. Regardless, it can be inferred from Plaintiffs' allegations of FCF's involvement in recruiting that the recruiters *were* part of the venture. Compl. ¶¶187-190.

Second, there is no requirement that Rongcheng City and Rongcheng Ocean share profits and risks with *each other* for each to be in separate (FIP) ventures with Bumble Bee or to play parallel roles in an integrated venture. Bumble Bee and FCF participate in parallel sub-ventures with each. For example, in *Wyndham*, a sex-trafficking victim alleged her trafficker participated in a venture with multiple, competing hotels where she was trafficked. 2025 WL 824369 at *6. That the hotels may have been competitors does not mean the trafficker did not participate in parallel ventures with each. *See id.* at *8-16. Moreover, Bumble Bee seeks to improperly draw an inference in its favor that Rongcheng

City and Rongcheng Ocean are indeed competitors. The Complaint does not allege these companies are competitors, and discovery may reveal that as exclusive suppliers of Bumble Bee each gains an advantage through their joint participation in a venture with Bumble Bee by growing Bumble Bee's market share vis-a-vis *Bumble Bee's* competitors.[3]

Finally, as detailed above, FCF's presence in the venture does not diminish the strength of Bumble Bee's participation. Even to the extent that, contrary to Plaintiffs' allegations, the relationship flowed exclusively through FCF, Bumble Bee cites no authority to suggest that all venture participants must have a direct relationship with each other; indeed, the authority is to the contrary. *See Maslic*, 2021 WL 5415261, at *6 (general contractor's client participated in a venture with subcontractor). What matters is that all participants are taking part in the same undertaking – here, producing Bumble Bee-branded tuna for sale in the U.S. market.[4] *Apple*, 96 F.4th at 414-15. The extensive allegations, Compl. ¶¶147-251, detailing the direct collaboration between the venture participants, including directly between Bumble Bee and the vessels, show that the venture is far more than an "ordinary buyer-seller transaction." *See Salesforce.com*, 76 F.4th at 562-63; *Lesnik*, 374 F.Supp.3d at 953.

## C.    The TVPRA Civil Remedy Applies Here

The vast majority of courts agree that the TVPRA civil remedy applies to the TVPRA's extraterritorial predicate offenses, including § 1589. Moreover, because the violation of § 1589(b)—benefiting from forced labor—occurred in the United States,

---

[3] Had Plaintiffs Angga and Sahruddin, who allege forced labor by Rongcheng City, filed a separate suit from Plaintiffs Akhmad and Syafi'i, who allege forced labor by Rongcheng Ocean, there would be no argument that Bumble Bee's dealings with one entity defeats its participation in a venture with the other. Discouraging joinder of such closely related claims would create an absurd result.

[4] The venture may be analogized to a chain conspiracy, which does not require "direct contact or explicit agreement" between each conspirator as long as each "knew of each other's participation in the illegal enterprise and benefitted from it," which is indisputably true here. *U.S. v. Arbelaez*, 719 F.2d 1453, 1458-59 (9th Cir. 1983) (internal quotation marks omitted). Each participant in the venture can participate in a different way.

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
Case No.: 3:25-cv-00583-MMA-DEB

1    Plaintiffs' claim does not require extraterritorial application of the TVPRA at all.

2    After enacting the Trafficking Victims Protection Act in 2000, Congress has

3    expanded and strengthened the statute through successive reauthorizations. In 2003,

4    Congress added a civil remedy coextensive with three TVPRA predicate criminal offenses.

5    TVPRA of 2003, Pub. L. No. 108-193, § 4(a)(4)(A), 117 Stat. 2875,2878. In 2005,

6    Congress extended extraterritorial jurisdiction over trafficking offenses committed by

7    persons "employed by or accompanying the Federal Government outside the United

8    States." TVPRA of 2005, Pub. L. No. 109-164, §103(a), 119 Stat. 3558, 3562. In 2008,

9    Congress made the civil remedy coextensive with all the TVPRA criminal offenses and

10   extended extraterritorial jurisdiction over six of those criminal offenses, including § 1589,

11   when committed by a United States national (along with certain others). TVPRA of 2008,

12   Pub. L. No. 110-457, §§ 222, 223(a), 122 Stat. 5044, 5067- 71.

13   ### 1.    The TVPRA civil remedy is expressly extraterritorial

14   In light of the statute's interlocking predicate act structure and its amendment

15   history, no court in the Ninth Circuit has agreed with Defendant's argument that the

16   TVPRA civil remedy does not extend to extraterritorial conduct. *See Ratha v. Phatthana*,

17   2016 WL 11020222, at *6 (C.D. Cal. Nov. 9, 2016) (the "argument that TVPRA's

18   extraterritorial jurisdiction does not extend to civil actions has been overwhelmingly

19   rejected by the courts"). Furthermore, every Circuit to reach this question has concluded

20   that the TVPRA authorizes private parties to bring civil claims in a United States district

21   court for forced labor overseas. *Roe v. Howard*, 917 F.3d 229, 241-242 (4th Cir. 2019)

22   (civil remedy for domestic servitude in Yemen); *Adhikari v. Kellogg Brown & Root, Inc*.,

23   845 F.3d 184, 204 (5th Cir. 2017) (civil remedy is available under TVPRA for

24   extraterritorial predicate acts)[5]; *cf. U.S. v. Baston*, 818 F.3d 651, 666-71 (11th Cir. 2016)

25   (affirming restitution order for trafficking in Australia). In addition, every district court,

27   _____

28   [5] Defendant asserts the Fifth Circuit acted "without analysis," Def.'s Mem. at 19, but the opinion contains an extensive discussion of the presumption against extraterritoriality and the relevant Supreme Court caselaw. *Adhikari*, 845 F.3d at 192.

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
Case No.: 3:25-cv-00583-MMA-DEB

except the outlier relied upon by Defendant, Def.'s Mem. at 21, has agreed that the TVPRA civil remedy extends to extraterritorial conduct. *E.g., Abernathy v. Carlyle Grp.*, 2024 WL 5331993 at *14 (D.D.C. Sept. 27, 2024); *Abafita v. Aldukhan*, 2019 WL6735148, at *5 (S.D.N.Y Apr. 4, 2019) ("the TVPRA has extraterritorial effect"); *Ratha*, 2016 WL 11020222 at *5 ("Congress has clearly indicated that it intends the TVPRA, unlike statutory schemes that are silent on extraterritorial jurisdiction, to be a unified statutory scheme of interlocking provisions that provides extraterritorial jurisdiction over specific predicate offenses and further expressly provides for restitution and a civil remedy whenever a court in the United States has that jurisdiction.").[6]

To determine if a statute applies extraterritorially, courts use a two-step inquiry. *RJR Nabisco*, 579 U.S. at 325. At the first step, the court must determine whether the statute gives a clear affirmative indication that it applies extraterritorially. *RJR Nabisco*, 579 U.S. at 337; *Morrison*, 561 U.S. at 255. This is not a "clear statement rule." *See RJR Nabisco*, 579 US. at 340 ("an express statement of extraterritoriality is not essential"); *Morrison*, 561 U.S. at 265. If the statute does not satisfy step one, a court moves on to step two. *RJR Nabisco*, 579 U.S. at 337. At step two, courts look to the statute's "focus": "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." *Id*. It is unnecessary to reach step two if the court finds the statute applies extraterritorially at step one. *Id*. at 337, 342.

The TVPRA civil remedy applies extraterritorially for the same reason the Supreme Court found that RICO § 1962 had extraterritorial application at step one: "the most obvious textual clue" is that § 1962 incorporates "a number of predicates that plainly apply

---

[6] *See also Jacobs Sols.*, 2025 WL 1766069, at *12-13 (civil claims for extraterritorial §1589(b) violation); *U.S. ex rel. Fadlalla* v. *DynCorp Int'l LLC*, 402 F.Supp.3d 162, 198-99 (D. Md. 2019); *Aguilera v. Aegis Commc'ns Grp., LLC*, 72 F. Supp. 3d 975, 979 (W.D. Mo. 2014) (§ 1595 remedy for forced labor in India); *cf. Plaintiff A v. Schair*, 2014 WL 12495639, at *6 (N.D. Ga. Sept. 9, 2014) (plaintiffs trafficked in Brazil could salvage their civil claim "if section 1596 could be retroactively applied.").

to at least some foreign conduct." *RJR Nabisco*, 579 U.S. at 338-41. In *RJR*, the Supreme Court explained that "the most obvious textual clue is that RICO defines racketeering activity to include a number of predicates that plainly apply to at least some foreign conduct" and held that "Congress's incorporation of these (and other) extraterritorial predicates into RICO gives a clear, affirmative indication that § 1962 applies to foreign racketeering activity – but only to the extent that the predicates alleged in a particular case themselves apply extraterritorially." *Id.* at 338-39. Although § 1962 was itself silent on extraterritorial reach, the Supreme Court nonetheless found that the presumption against extraterritoriality was rebutted by the incorporation of extraterritorial predicates. *RJR Nabisco*, 579 U.S. at 338.

The TVPRA is an easier analysis than RICO. As was the case with the RICO predicate offenses, Congress made some, but not all, of the TVPRA predicate offenses extraterritorial. *Supra* p.16. Because TVPRA § 1595 (the civil remedy) directly incorporates these extraterritorial predicates, it presents a clear affirmative indication of extraterritorial application. *Howard*, 917 F.3d at 242 ("Applying this rule to the TVPA, we are satisfied that § 1595 reflects congressional intent that it applies extraterritorially to the extent that a plaintiff seeks redress for a predicate offense 'that is itself extraterritorial.'"); *Adhikari*, 845 F.3d at 204 ("[B]y conferring 'extraterritorial jurisdiction over any offense … under' the TVPRA, § 1596 permits private parties to pursue a civil remedy under the TVPRA for extraterritorial violations"). As the Fourth Circuit explained,

> Applying the first step of the *RJR Nabisco* inquiry, we are satisfied that § 1595 of the TVPA evinces a "clear indication of extraterritorial effect," … Of crucial importance, § 1595 directly incorporates predicate offenses that govern foreign conduct, providing strong textual evidence of its extraterritorial effect when applied to those predicates. …

*Howard*, 917 F.3d at 241-42 (internal citations omitted). The textual signal is even more direct here than it was in RICO because both the civil remedy that incorporated the predicate offenses and the express statement of extraterritorial jurisdiction over those same predicate offenses appear in the same Chapter of the U.S. Code, in consecutive code provisions, unlike RICO which relied on a longer daisy chain of definitional provisions.

Bumble Bee's efforts to distinguish this analysis – which has been adopted by all but one outlier court in an opinion now on appeal – is unavailing. For example, Defendant complains, Def.'s Mem. at 25, that § 1595 is "silent" on extraterritorial application – but another TVPRA provision, the very next code section (§ 1596), provides for extraterritorial jurisdiction. As the Supreme Court has explained, "Congress, even in a jurisdictional provision, can indicate that it intends federal law to apply to conduct occurring abroad." *Kiobel v. Royal Dutch Petroleum Co*., 133 S. Ct. 1659, 1665 (2013); *see also Adhikari*, 845 F.3d at 204 (§ 1596 although jurisdictional in nature, alters a party's substantive rights). The TVPRA, unlike RICO, is not silent on extraterritoriality. *Abernathy*, 2024 WL 5331993 at *11.

Bumble Bee also complains that Congress did not list § 1595 among the criminal offenses listed in the statute's jurisdictional provision (§ 1596). That makes no sense: §1595 does not define a criminal offense, it provides a civil remedy for offenses that are defined elsewhere. *See Abernathy*, 2024 WL 5331993 at *12; *U.S. ex rel. Hawkins v. ManTech Int'l Corp.*, 752 F. Supp. 3d 118, 134 (D.D.C. 2024). All that Congress needed to do to ensure the civil remedy applied to extraterritorial conduct was to provide for extraterritorial jurisdiction over the underlying conduct. That is, once a court has jurisdiction over, for example, forced labor, the statute's civil remedy provision (as well as provisions for mandatory restitution (§1593) and forfeiture (§1594)) attach. It makes no sense to argue that § 1595 (not an offense) should be added to § 1596's list of predicate offenses. *Abernathy*, 2024 WL 5331993 at *12.

Finally, Bumble Bee points to a different RICO provision (§ 1964) that was found not to be extraterritorial, but that holding turned on textual limitations that are not present here. *E.g.*, *Abernathy*, 2024 WL 5331993 at *11. The Supreme Court held that RICO § 1964 did not reach extraterritorial conduct because in contrast to § 1962, § 1964 was not coextensive with the extraterritorial predicate statutes. Congress had limited the scope of § 1964 by excluding certain claims and limiting compensable injuries. *See RJR Nabisco*, 579 U.S. at 350 ("Congress signaled that the civil remedy is not coextensive

with § 1962's substantive prohibitions."); *Howard*, 917 F.3d at 243 (distinguishing § 1962 from § 1964: because "Justice Alito emphasized that the text of §1964(c) limited its application to certain types of injuries" and concluding "In that regard, § 1595 of the TVPA resembles § 1962 of RICO rather than the circumscribed text of § 1964(c)"). The TVPRA's civil remedy, by contrast, is coextensive with its substantive predicate offenses, and Congress has only expanded, not contracted, its scope.

Congress is well aware of the cases holding that the TVPRA reaches extraterritorial conduct, as is the Supreme Court. Br. Of Members of Congress Senator Blumenthal, et al. at 6, 24-25, *Nestle USA, Inc. v. Doe*, Nos. 19-416, 19-453 (2020),2020 WL 6322316; *Nestle USA, Inc. v. Doe*, 593 U.S. 628, 653-655 (2001). The TVPRA has been reauthorized in the interim, and Congress has not sought to amend after these decisions.

Because § 1595 satisfies step one, it is unnecessary to reach step two. But to the extent the Court proceeds to step two and considers the "focus" of the claims that Defendants benefitted from forced labor, the focus of § 1589(b) is plainly on "benefitting." Where the benefit is obtained in the United States, the application of the statute is not extraterritorial at all. *See Rodriguez v. Pan Am. Health Org*. ("PAHO"), 29 F.4th 706, 716-17 (D.C. Cir. 2022) (gravamen of 1589(b) benefitting claim was in the United States: "Apart from the wrongful conduct PAHO allegedly participated in abroad, the physicians also allege wrongful conduct that occurred entirely within the U.S").

> 2. <u>Plaintiffs allege an 18 U.S.C. § 1589(b) violation in the United States</u>

Defendant asserts that the Complaint does not allege any TVPRA violation in the United States – that is flatly wrong. Plaintiffs allege a violation of 18 U.S.C. 1589(b). *E.g.* Compl. ¶255. That violation occurred in the United States. *Id*. ¶¶12-13, 204, 208.

The plain text of § 1589(b) makes it a violation of the TVPRA to benefit from participation in a venture which has engaged in obtaining labor or services "by any of the means described in subsection (a)." Those means (force, threats, abuse of law) are not limited to conduct in the United States. *E.g*., *PAHO*, 29 F.4th at 715-16 (§ 1589(b)

1   claims by physicians subject to forced labor in Brazil); *U.S. ex rel. Fadlalla v.*

2   *DynCorp Int'l*, 402 F. Supp. 3d 162, 196 (D. Md. 2019) (defendants liable under

3   §1589(b) for benefitting from forced labor in Middle East). Under §1589(b),

4   knowingly benefitting from forced labor is *itself* a criminal violation of the TVPRA.

5   *See Sherman v. Trinity Teen Sols*., 84 F.4th 1182, 1187 (10th Cir. 2023) (plaintiffs

6   raised three TVPRA claims, including a violation of § 1589(b)); *PAHO*, 29 F.4th 706,

7   716 (D.C. Cir. 2022) ("The physicians allege that PAHO committed a financial crime

8   in the U.S., see 18 U.S.C. 1589(b)"); *Bistline v. Parker*, 918 F.3d 849, 873 (10th Cir.

9   2019) ("§ 1589 holds not just primary offenders accountable but also anybody who

10  knowingly 'benefits, financially or by receiving anything of value, from participation

11  in a venture which has engaged in' forced labor" in § 1589(b)); *Gilbert v. U.S.*

12  *Olympic Comm.*, 423 F. Supp. 3d 1112, 1131 (D. Colo. 2019); *Paguirigan v. Prompt*

13  *Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 439–40 (E.D.N.Y. 2017). Section

14  1589(b) is a separate and independent violation of the TVPRA. Bumble Bee's

15  violation of § 1589(b) occurred in the United States. Compl. ¶¶12-13, 204, 208.

## II.    PLAINTIFFS HAVE STANDING FOR INJUNCTIVE RELIEF

17          Standing for injunctive relief is satisfied by allegations of "a concrete and

18  particularized legal harm, coupled with a sufficient likelihood that [the plaintiff] will again

19  be wronged in a similar way." *Fellowship of Christian Athletes v. San Jose Unified Sch.*

20  *Dist. Bd. of Educ.*, 82 F.4th 664, 680-81 (9th Cir. 2023) (en banc) (quotation marks

21  omitted). Here, Plaintiffs have suffered a concrete and particularized harm. Compl. ¶¶96-

22  146. Moreover, Plaintiffs' allegations demonstrate a likelihood of an ongoing wrong: they

23  are from rural Indonesia where economic opportunity is limited, which is the reason they

24  took jobs on distant-water fishing vessels. *Id.* ¶¶4, 96, 107, 120, 132. If the Court deems it

25  necessary, Plaintiffs can amend the Complaint to clarify and strengthen their allegations to

26  specifically allege that they would seek similar jobs in the future if Bumble Bee adopted

27  policies – such as bans on recruitment fees and transshipment and mandatory rest periods

28  and shore leave – that adequately guarded against future forced labor violations.

These facts suffice. When the harm alleged is due to a written policy or lack of policy, "there is an implicit likelihood of its repetition in the immediate future." *Christian Athletes*, 82 F.4th at 681; *see also, e.g.*, *Sims v. City of Seattle*, 2023 WL 3619019, at *5 (W.D. Wash. May 24, 2023) (standing for injunctive relief exists at motion to dismiss stage "where plaintiffs successfully alleged either a written policy or pattern of officially sanctioned behavior."). Allegations that a plaintiff has refrained from taking a certain action because of the defendants' ongoing conduct likewise suffices to show injunctive standing. *See Christian Athletes*, 82 F.4th at 681-82; *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 970-71 (9th Cir. 2018). Plaintiffs' requested injunctive relief would remedy the future harm. Bumble Bee argues that no vessels themselves are before the Court, but Bumble Bee has the power to (and does) set, monitor, and enforce standards for vessels in its fleet. Compl. ¶¶159-61, 192-97, 226-30, 234, 237.

Bumble Bee's arguments in footnotes 5 and 6 are merits arguments that (1) are not properly raised, *see Khoja v. Orexigen Therapeutics, Inc.*, 498 F. Supp.3d 1296, 1309 n.4 (S.D. Cal, 2020); (2) are premature at this stage, *see Franklin v. Scribner*, 2011 WL 1311743, at *10 (S.D. Cal. Apr. 4, 2011) (Anello, J.);[7] and (3) are wrong. Injunctive relief is a proper remedy for Plaintiffs' negligence claim under California law, which allows injunctions "to prevent the breach of an obligation" (i.e., negligence).[8] Cal. Civ. Code § 3422 (West, Westlaw through 2025 Ch. 45 of Reg. Sess.); *see also Richardson v. Kier*, 37 Cal. 263 (1869) (affirming entry of injunction as remedy for negligence). Bumble Bee's single case reached its conclusion only because the plaintiff there, apparently unaware of *Richardson*, failed to cite a negligence case applying injunctive relief. *S.F. Herring Assoc.*

---

[7] This Court confronted a standing issue, not a merits issue, in *Martinez v. Ford Motor Co.*, as the plaintiff "had not alleged any threat of future harm." 2023 WL 2977727, at *7 (S.D. Cal. Apr. 17, 2023). Although Bumble Bee framed its argument in footnote 5 as a redressability issue, it conflates redressability with the merits. *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 63 (9th Cir. 2024).

[8] Although California negligence law typically uses the term "duty," this is synonymous with "obligation." *See Obligation*, Black's Law Dictionary (12th ed. 2024).

*v. PG&E*, 2019 WL 11073502, at *3 (N.D. Cal. Jul. 26, 2019). This does not overturn *Richardson*.[9] Lastly, damages alone would be inadequate relief here; the jury could find it too speculative to award future lost income for the remainder of Plaintiffs' working lives, as Bumble Bee might someday voluntarily change its policies, enabling Plaintiffs to return to working at sea.

## III. PLAINTIFFS STATE A NEGLIGENCE CLAIM

California "Civil Code section 1714 establishes a general duty to exercise ordinary care in one's activities," *Kesner v. Super. Ct.*, 384 P.3d 283, 290 (Cal. 2016), including a duty "not to place another person in a situation in which the other person is exposed to an unreasonable risk of harm through the reasonably foreseeable conduct . . . of a third person." *Lugtu v. Calif. Highway Patrol*, 28 P.3d 249, 256 (Cal. 2001).

Bumble Bee argues that Plaintiffs' allegations fall outside the general duty of care because a defendant ordinarily does not owe a duty to protect a plaintiff from a third-party. But "[t]his rule, based on the concept that a person should not be liable for nonfeasance (failure to act as a good Samaritan) has no application where the defendant, through his own action (misfeasance) has worsened the plaintiff's position and has created a foreseeable risk of harm from a third person." *Michael R. v. Jeffrey B.*, 205 Cal. Rptr. 312, 319 (Cal. Ct. App. 1984); *see also, e.g.*, *Lugtu*, 28 P.3d at 257; *Weirum v. RKO Gen., Inc.*, 539 P.2d 36, 41 (Cal. 1975); Restatement (Second) of Torts § 302 cmt. a. (Am. L. Inst. 2024 update) ("In general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act."). California courts distinguish between cases of nonfeasance, in which a duty applies only in limited circumstances, and misfeasance, in which the general duty of care applies. *See, e.g.*, *Lugtu*, 28 P.3d at 256-57. "Misfeasance

---

[9] The law's relative silence on the question is because negligence is "less frequently the subject of suit for injunction," though the Restatement clarifies that, consistent with *Richardson*, generally applicable rules for injunctive relief apply to negligence claims. Restatement (Second) of Torts, Ch. 48 Scope Note.

exists when the defendant is responsible for making the plaintiff's position worse, i.e., defendant has created a risk." *Id.* at 256-57 (cleaned up). Nonfeasance exists only where "third-party conduct was the *sole* cause of the alleged harm." *Hacala v. Bird Rides, Inc.*, 306 Cal. Rptr. 3d 900, 915 (Cal. App. 2023) (emphasis in original).

Here, Plaintiffs allege misfeasance: Bumble Bee was negligent because it took steps that "created a risk" that Plaintiffs would be abused. *Lugtu*, 28 P.3d at 256-57; *see also* Compl. ¶256. Plaintiffs allege Bumble Bee, in collaboration with FCF, structured its distant-water fishing operations so that the long-line vessels would stay at sea for months at a time. *Id*. ¶¶29-31, 161, 176-82, 241-45. Bumble Bee collaborated with FCF to establish and operate supply and transshipment ships, which enabled the vessels in its "trusted network" to stay at sea, thereby facilitating forced labor. *Id.* ¶¶161, 176-82. Aware of the potential for harm to migrant fishers, Bumble Bee nonetheless incentivized these practices, providing the vessel owners who followed the recommended practices a reliable market for their catch. *Id.* ¶171-73, 158-66. Bumble Bee's affirmative actions thus created the opportunity and incentive for the vessel owners to abuse Plaintiffs. *See Pamela L. v. Farmer*, 169 Cal. Rptr. 282, 284 (Cal. App. 1980); *see also, e.g.*, *Adhikari v. KBR Inc.*, 2017 WL 4237923, at *10 (S.D. Tex. Sept. 25, 2017) (defendant had duty to protect forced-labor victims from contractor's foreseeable conduct); *Deutsche Bank*, 671 F.Supp.3d at 414 (defendant banks violated general duty of care to sex trafficking victims because their actions "'helped "set in motion' Jeffrey Epstein's sex-trafficking venture [] by providing the cash that fueled it").[10]

Alternatively, Bumble Bee owed Plaintiffs a duty because it controlled the vessels on which Plaintiffs were abused, which Bumble Bee concedes would suffice even in a nonfeasance case. *See* Def.'s Mem. at 24 (citing *Brown v. USA Taekwondo*, 253 Cal. Rptr.

---

[10] Whether Bumble Bee's actions amount to a breach of its duty or caused Plaintiffs' injuries is beyond the scope of the present motion. Bumble Bee does not argue breach or causation, and rightfully so, as these are questions for the jury. *See, e.g.*, *Hernandez v. Jensen*, 276 Cal. Rptr. 3d 281, 288 (Cal. App. 2021).

3d 708, 725-26 (Cal. Ct. App. 2019)). Bumble Bee set and enforced policies and procedures that each vessel in its FIPs were required to follow, including the vessels on which Plaintiffs were abused. Compl. ¶¶225-29. Plaintiffs also allege Bumble Bee sets policies and procedures for the vessels in its fleet through the FCF "Social Responsibility Program." *Id.* ¶192. Bumble Bee is thus more similar to USA Taekwondo ("USAT"): the coach was registered with USAT and subject to USAT's policies and procedures, and USAT had the power to set policies and procedures to protect the plaintiffs from the coach's abuse. 253 Cal. Rptr. 3d at 1094. By contrast, *Brown* found the U.S. Olympic Committee ("USOC") had no duty because it only indirectly exercised control over the coach that was "too remote to create special relationship." *Id.* at 1102. Plaintiffs allege Bumble Bee had direct control over the offending vessels, akin to USAT's control over the coach in *Brown*. *E.g.*, Compl. ¶226. In sum, while Plaintiffs allege misfeasance that triggers Bumble Bee's general duty of care, Bumble Bee nevertheless had a duty to protect Plaintiffs from the vessels in its fleet.

## IV.    LEAVE TO AMEND

In the event the Court finds any of Plaintiffs' allegations insufficient, Plaintiffs request leave to amend. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003); Fed. R. Civ. P. 15(a). Dismissal without leave to amend is proper only in "extraordinary cases." *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003) (citation omitted).

## V.    CONCLUSION

For the above reasons, the Court should deny Bumble Bee's motion to dismiss.

Dated: July 31, 2025                    Respectfully submitted,

                                        COHEN MILSTEIN SELLERS & TOLL PLLC

                                        By: */s/ Agnieszka M. Fryszman*
                                        Agnieszka M. Fryszman

                                        *Counsel for Plaintiffs*