1  Agnieszka M. Fryszman [DC Bar No. 459208]
   *pro hac vice*
2  Nicholas J. Jacques [DC Bar No. 1673121]
   *pro hac vice*
3  **COHEN MILSTEIN SELLERS & TOLL PLLC**
   1100 New York Ave. NW, Suite 800
4  Washington, DC 20005
   202-408-4600
5
   Paul L. Hoffman [CA Bar No. 071244]
6  **SCHONBRUN SEPLOW HARRIS**
   **HOFFMAN & ZELDES, LLP**
7  200 Pier Ave., Suite 226
   Hermosa Beach, CA 90254
8  424-297-0114

9  *Attorneys for Plaintiffs*

10 *[Additional Counsel Continued on*
   *Next Page]*
11

12              **UNITED STATES DISTRICT COURT**
13             **SOUTHERN DISTRICT OF CALIFORNIA**

14 Akhmad; Angga;                      **Case No. 3:25-cv-00583-BAS-DEB**
15 Muhammad Sahrudin;
   and Muhammad Syafi'i
16                                      **FIRST AMENDED COMPLAINT FOR**
                                        **DAMAGES**
17              Plaintiffs,
                                        **DEMAND FOR JURY TRIAL**
18       vs.

19 BUMBLE BEE FOODS, LLC
   280 10th Avenue,
20 San Diego, CA 92101

21
                Defendant.
22

23

24

25

26

27

28

1 | *[Additional Counsel Cont. from previous page]*

2
3 | Helen I. Zeldes [CA Bar No. 220051]
Aya Dardari [CA Bar No. 344039]
**SCHONBRUN SEPLOW HARRIS**
**HOFFMAN & ZELDES, LLP**
4 | 501 W. Broadway, Suite 800
San Diego, CA 92101
5 | 619-400-4990

6
7 | Marco Simons [CA Bar No. 237314]
Asia Arminio |DC Bar No. 996077|
*pro hac vice*
8 | **GREENPEACE, INC.**
1300 Eye Street NW, Suite 1100
9 | Washington, DC 20005
202-462-1177

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

## COMPLAINT

Plaintiffs Akhmad, Angga, Muhammad Sahrudin, and Muhammad Syafi'i bring this action against Defendant Bumble Bee Foods, LLC. Plaintiffs allege as follows:

## INTRODUCTION

1.    Congress passed the Trafficking Victims Protection Act in 2000, and over the two-and-a-half decades since has repeatedly reauthorized and expanded it to provide a meaningful tool to combat human trafficking and forced labor. Among the tools Congress created was a civil remedy for victims of trafficking and forced labor, which in 2008 it expanded to authorize survivors to bring suit against persons, including corporations, that knew or should have known that they were benefitting from participation in a venture engaged in forced labor, debt bondage, or other abuses.

2.    Congress's strong and persistent attention to the problem of human trafficking is based on its longstanding recognition that trafficking has emerged "as the dark side of globalization."[1]

3.    This action is brought by survivors of human trafficking, forced labor and debt bondage in the longline tuna fishing industry.

4.    The Plaintiffs, villagers in rural Indonesia, applied for jobs as fishers in the commercial fishing industry. They were put to work on vessels that are part of the "trusted network" of longline fishing vessels from which Bumble Bee sources its albacore tuna, part of a long-term venture designed and operated to maximize profits.

5.    Instead of good jobs at the promised wages, the men were subjected to physical abuse and violence, deprived of adequate food, and denied medical care (and put back to work) even when seriously injured. The men were ensnared by debt bondage, which meant they would owe money if they quit their jobs. The fees, deductions, and penalties left them with little to no wages for their months of hard labor. Because the supply chain was structured so that the vessels stayed at sea – supply ships

[1] H.R. Rep. No. 110-430, Pt. 1, at 33 (2007).

3

restocked the fishing vessel and collected the catch on the high seas, a practice called transshipment – the men were isolated, at the mercy of the captain and cut off from sources of potential assistance. The men repeatedly asked to go home, even banding together in work stoppages, but were not permitted to leave their vessels.

6.      It is well known that forced labor is prevalent in certain longline fleets. Likewise, the types of abuses inflicted on the Plaintiffs have been well-documented and identified as indicia of forced labor by governments, non-governmental organizations and the media.

7.      Despite the widespread and well-documented abuses, tuna harvested with forced labor was imported into the United States by Bumble Bee and delivered to grocery store shelves where it was bought by American consumers.

**PARTIES**

*Plaintiffs*

8.      Akhmad is an Indonesian citizen who resides in Java, Indonesia. As described in more detail below (*see* paragraphs 96 to 106), he applied for work in the commercial fishing industry but was instead subjected to forced labor on the *Run Da 5*, part of the "trusted network" of vessels from which Bumble Bee sources its tuna. The captain beat Akhmad, including with a metal hook, too many times to count. The captain also failed to provide medical attention when Akhmad was seriously injured – a rope broke, sending a load of fish onto Akhmad, gashing his leg to the bone. Although he was bleeding so much his boot filled with blood, the captain initially insisted Akhmad keep working. Akhmad repeatedly asked to go home but was not allowed to leave the ship. Eventually, his wife contacted an Indonesian Union, SBMI, which intervened and, along with the International Organization for Migration and local police, obtained Akhmad's release.

9.      Angga is an Indonesian citizen who resides in Java, Indonesia. As described in more detail below (*see* paragraphs 107 to 119), he applied for work in the commercial fishing industry but was instead subjected to forced labor on the *Lu Rong*

*Yuan Yu 878*, part of the "trusted network" of vessels from which Bumble Bee sources its tuna. On board, Angga was subject to harsh conditions and abuse, including beatings and being stabbed with a needle. The fishers were fed so little that they resorted to eating the bait fish. He and his fellow fishers repeatedly asked to go home but were not allowed to leave the ship. Eventually, after the crew members joined together in a work stoppage, they were permitted to leave. When he returned home, he learned that his family had never received the promised pay for his many months of forced labor at sea.

10.    Muhammad Sahrudin is an Indonesian citizen who resides in Kalimantan, Indonesia. As described in more detail below (*see* paragraphs 120 to 131), he applied for work in the commercial fishing industry but was instead subjected to forced labor on the *Lu Rong Yuan Yu 878*, part of the "trusted network" of vessels from which Bumble Bee sources its tuna. The captain abused the crew, hitting them and stabbing them with a needle. Sahrudin was beaten so many times, he cannot recall the exact number. He was also lashed on his back, as were other fishers. The captain ignored their requests to leave, although supply vessels came and went, until the crew joined together and refused to work if they were not repatriated.

11.    Muhammed Syafi'i is an Indonesian citizen who resides in Java, Indonesia. As described in more detail below (*see* paragraphs 132 to 144), he applied for work in the commercial fishing industry but was instead subjected to forced labor on the *Lu Rong Yuan Yu 211*, part of the "trusted network" of vessels from which Bumble Bee sources its tuna. Syafi'i did not receive medical care after suffering horrific burns in an accident but was instead left to die. When he did not die, the captain insisted he go back to work or pay a fee to eat. Syafi'i was not permitted to leave the ship despite making multiple requests to leave so he could seek medical care, resulting in permanent injuries.

### *Defendant*

12.    Defendant Bumble Bee Foods, LLC is incorporated in Delaware and has its principal office at 280 10th Avenue, San Diego, CA 92101. Bumble Bee imports, processes, produces, markets, and distributes canned and pouch-packaged tuna

products, meal kits, and snack products in the United States.

13.    Bumble Bee's revenues exceed $ 1 billion annually.

14.    Since 2020, Bumble Bee has been wholly owned by FCF Co. Ltd. FCF is one of the three largest global tuna traders. It is incorporated in Taiwan and has its principal office at No. 8 Minquan 2nd Road, 28th Floor Kaohsiung City 806616, Taiwan.

## JURISDICTION AND VENUE

15.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, this action involving questions of federal law; 18 U.S.C. § 1596, this action involving an offense under the federal Trafficking Victims Protection Act, 18 U.S.C. §§ 1589, et seq., and the offender is a national of the United States or present in the United States, irrespective of nationality; 28 U.S.C. § 1332, this action being between citizens of a foreign state and a citizen of California for damages exceeding $75,000. The supplemental jurisdiction of this Court is additionally invoked pursuant to 28 U.S.C. § 1367.

16.    The Court has personal jurisdiction over Defendant Bumble Bee under Federal Rule of Civil Procedure 4(k)(1) and California Code of Civil Procedure § 410 because Defendant Bumble Bee's principal place of business is in California.

17.    Venue is proper under 28 U.S.C. § 1391(b)(1), (c)(2) & (d) because Defendant Bumble Bee's principal place of business is in this District.

## FACTUAL ALLEGATIONS

### Background on Trafficking in Persons

18.    Human trafficking and forced labor are a widespread problem. The International Labour Organization estimates that in 2022, 27.6 million people were trapped in forced labor and notes that forced labor "disrupts fair competition between businesses."

19.    Most forced labor occurs in the private economy, 63% in forced labor exploitation and 23% in forced commercial sexual exploitation.

20.   The annual profit generated from forced labor is estimated at $236 billion.

21.   The Asia and the Pacific region has the highest number of people in forced labor.

### Background on the Fishing Industry

22.   Fish is the most highly traded food commodity.

23.   In 2018, fish exports generated $164 billion, half of which came from developing countries.

24.   The U.S. government has highlighted fishing as among a small group of industries in which forced labor is particularly prevalent.

25.   The United Nations estimates that approximately 128,000 workers are currently subjected to forced labor on remote fishing vessels worldwide.

26.   Longline fishing is labor intensive. Workers place bait on some 2,500 to 3,000 hooks on hanging lines which can extend from 10 to 100 kilometers from the vessel. The lines are then recovered once or twice per day.

27.   Albacore tuna is commonly caught by longline vessels.

28.   Several vessels owned by the same owner may coordinate their voyages.

29.   Vessels, particularly those in Defendant Bumble Bee's trusted fleet, transfer their catches to reefers, or refrigerated cargo vessels. The vessels may also receive supplies of fuel, food, and water at sea. Such transfers and receipts at sea are referred to as transshipment.

30.   The use of transshipment at sea enables fishing vessels to remain at sea for months or even years at a time without ever returning to land. Transshipment also makes it easier to mingle catch, including catch from vessels that use forced labor.

31.   The U.S. government, non-government organizations, academic researchers, and labor-rights advocates have linked transshipment at sea to human trafficking and forced labor, as it allows vessels to keep their crew at sea indefinitely and reduces oversight.

32.   The fishing fleets that rely on transshipment are primarily owned by

7

Russian, Mainland Chinese, Korean, Taiwanese, and Japanese businesses.

33.    Fishers working on distant-water vessels such as the longline vessels where Plaintiffs were put to work are extremely vulnerable. They are isolated far from land and with little to no means of escaping or obtaining help for – or even reporting – their conditions.

34.    Because distant water fishing is labor intensive, the use of low-wage migrant labor and exploitation of forced labor can cut operating costs considerably and give fishing operators a competitive advantage.

35.    The Mainland Chinese and Taiwanese longline fleets in particular rely on migrant fishers, including men from rural Indonesia.

**The Problem of Forced Labor on Longline Fishing Vessels is Well Known**

36.    For decades, governments, international organizations, non-governmental organizations and the media have reported on the problem of forced labor on distant water fishing vessels, particularly longline tuna vessels that rely on migrant fishers.

37.    The risk factors and red flags are well known. They include reliance on migrant workers; the use of labor brokers, particularly agents who utilize deceptive or coercive recruitment practices; debt bondage, wage garnishment, and non- or underpayment of wages; long working hours; isolation at sea, including as a result of transshipment; physical abuse; lack of food of adequate quantity or nutritious value; and poor living conditions.

38.    The Mainland Chinese and Taiwanese longline tuna fleets have long been recognized as fleets where these practices, and, as a result, forced labor, are prevalent. The United States has gone so far as to bar tuna from certain Mainland Chinese and Taiwanese vessels from the United States because it was harvested with forced labor.

39.    Indonesia has been recognized as a source country for trafficked fishers, particularly men from rural communities who become victims of debt bondage.

/ / /

/ / /

FIRST AMENDED COMPLAINT

Case No. 3:25-cv-00583-BAS-DEB

**The United States has for decades reported on and taken steps to combat forced labor on tuna fishing vessels**

40.    The U.S. Government has consistently and repeatedly highlighted the problem of forced labor on distant-water fishing vessels. For many years, the United States has pointed to the red flags that indicate human trafficking and forced labor, identified Indonesia as a source country for rural men exploited in the fishing industry, and highlighted the prevalence of that conduct on the fleets relevant to this case.

41.    Each year, the United States Department of State compiles a Trafficking in Persons Report ("TIP Report") with data from U.S. embassies, government officials, organizations, and news sources worldwide.

42.    The TIP Report has reported on forced labor in the fishing industry since at least 2007. In 2007, the U.S. State Department reported:

> Few environments are more conducive to exploitation than the high seas. Lured into well-paying fishing jobs, a significant number of fishermen and children find themselves confined and forced to work under terrible conditions with no escape or help possible. Many are subjected to beatings; deprived of food, water, and sleep; exposed to highly unsanitary conditions and infectious diseases; and forced to perform life-threatening work in unsafe conditions without pay.

U.S. Dep't of State, TIP Report 9 (2007).

43.    In 2010, the State Department reported that "labor exploitation is substantially higher in the fishing industry compared with other industries, such as construction or agriculture, with numerous documented cases of severe abuse, nonpayment and murder."  U.S. Dep't of State,  TIP Report 36 (2010); *see also* U.S. Dep't of State, TIP Report 21, 32 (2011) ("forced labor rampant in the commercial fishing industries in some regions" and "some owners of Asian fishing fleets and seafood companies that depend on their catches are relying on forced labor"); U.S. Dep't of State,  TIP Report 38 (2012) ("a series of media, government, and NGO investigations have drawn attention to the high prevalence of forced labor on fishing boats around the world").

44.    In 2016, the State Department reported

> In recent years, there has been growing international media attention on forced labor aboard fishing vessels in Southeast Asia, including investigative reports by the New York Times, Al Jazeera, The Guardian, South China Morning Post, and the Associated Press (AP), which won the 2016 Pulitzer Prize for Public Service. The quality and frequency of reporting by international media has helped raise awareness of forced labor in the fishing industry among governments, businesses, and consumers … Fishers aboard vessels in vast international waters are particularly vulnerable to human trafficking due to often protracted periods of time at sea and an inability to report mistreatment or escape their ships. Luring fishers with promises of good wages, traffickers force some to work under extreme conditions and deny them compensation or the freedom to leave.

U.S. Dep't of State, TIP Report 13, 35 (2016).

45.    As early as 2008, the State Department identified Indonesia as a source country of victims of forced labor on fishing vessels, and, in particular, flagged the plight of rural Indonesian men recruited to work on Taiwanese and Mainland Chinese vessels who become victims of forced labor, debt bondage and other abuses. *E.g.*, U.S. Dep't of State, TIP Report 239 (2008); 2012 TIP Report at 186; 2016 TIP Report at 203; U.S. Dep't of State, TIP; U.S. Dep't of State, TIP Report 228 (2018); U.S. Dep't of State, TIP Report at 244 (2019).

46.    The United States TIP report has specifically warned about the prevalence of forced labor in the Mainland Chinese and Taiwanese fishing fleets. *E.g.*, 2008 TIP Report at 239; U.S. Dep't of State, TIP Report 274 (2009); U.S. Dep't of State, TIP Report 353 (2013); U.S Dep't of State, TIP Report 368 (2014); U.S. Dep't of State, TIP Report 326 (2015); 2016 TIP Report at 359; 2017 TIP Report at 382-4; 2018 TIP Report at 407; 2019 TIP at 143; U.S. Dep't of State, 2024 TIP Report: Taiwan (2024); U.S. Dep't of State, 2024 TIP Report: China (2024).

47.    The State Department has also described the red flags that indicate human trafficking, often in its reporting on Indonesian fishers working on Taiwanese or

Mainland Chinese vessels. *E.g.*, 2008 TIP Report at 239 (describing job placement and service fees that are used as a tool for involuntary servitude); 2014 TIP Report at 368 (citing reports of non- or under-payment of wages, long working hours, physical abuse, lack of food, and poor living conditions); 2015 TIP Report at 279, 326. For example, in 2017, the TIP Report warned that

> fishermen on Taiwan-flagged fishing vessels, mostly from China, Indonesia, the Philippines, and Vietnam, experience non- or under-payment of wages, long working hours, physical abuse, lack of food, and poor living conditions, which are indicators of trafficking.

2017 TIP Report at 384.

48.    In 2020 the State Department reported that "Senior vessel crew on board Chinese, Korean, Vanuatuan, Taiwan, Thai, Malaysian, and Philippines-flagged and/or owned fishing vessels . . . subject Indonesian fishermen to forced labor." The report goes on to state that recruiters "lure" Indonesian fishers with false promises of high wages and then charge them fees that the recruitment agencies use to "withhold or withdraw funds from their salaries for years." Once on board the vessels, the Report states, Indonesian fishers face

> low or unpaid salaries and such coercive tactics as contract discrepancies, document retention, restricted communication, poor living and working conditions, threats of physical violence, and severe physical and sexual abuse.

2020 TIP Report at 261.

49.    The State Department's annual Country Reports on Human Rights Practices have similarly identified systemic issues and a pattern of forced labor against migrant fishers in the Mainland Chinese and Taiwanese distant water fishing fleets, including excessive recruiting fees, debt bondage, low payment or nonpayment of wages, instances of physical violence, and excessive work hours.[2]

---

[2] U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., Taiwan 2018 Human Rights Report 25; U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., Taiwan 2019 Human Rights Report 20; U.S. Dep't of State, Bureau of Democracy, H.R. and

11

50.     In 2020, the Department of Labor added Mainland Chinese and Taiwanese fish to its List of Goods Produced by Child Labor or Forced Labor – colloquially known as the "Dirty Goods List."  In support of this action, the Department of Labor highlighted reports of forced labor in both the Mainland Chinese and Taiwanese distant-water tuna industry.[3]

51.     U.S. Customs and Border Protection ("CBP") has on multiple occasions ordered that tuna harvested by certain Mainland Chinese and Taiwanese vessels be detained due to evidence of forced labor on board the vessels.[4]

52.     On August 18, 2020, CBP issued an order stating it would detain tuna harvested by the *Da Wang*, a Taiwanese-owned distant-water fishing vessel that supplied Bumble Bee, citing evidence indicating "the use of forced labor, including physical violence, debt bondage, withholding of wages, and abusive living and working

_____

Lab., Taiwan 2020 Human Rights Report 22-23; U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., Taiwan 2021 Human Rights Report 20; U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., Taiwan 2022 Human Rights Report 17-18; U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., Taiwan 2023 Human Rights Report 30; U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., China 2020 Human Rights Report.

[3] U.S Dep't of Lab., 2020 List of Goods Produced by Child Labor or Forced Labor 33, 74.

[4] U.S. Customs and Border Prot., CBP Issues Withhold Release Order on Seafood Harvested with Forced Labor by Lien Yi Hsing No. 12 (Dec. 31, 2020), https://www.cbp.gov/newsroom/national-media-release/cbp-issues-withhold-release-order-harvested-forced-labor#:~:text=WASHINGTON (Order based on forced labor indicators including deception, withholding of wages, and debt bondage); U.S. Customs and Border Prot., CBP Issues Detention Order on Seafood Harvested with Forced Labor (Aug. 18, 2020), https://www.cbp.gov/newsroom/national-media-release/cbp-issues-detention-order-seafood-harvested-forced-labor-0 (Order based on forced labor indicators including physical violence, debt bondage, withholding of wages, and abusive living and working conditions); U.S. Customs and Border Prot., CBP Issues Detention Order on Seafood Harvested with Forced Labor (May 11, 2020), https://www.cbp.gov/newsroom/national-media-release/cbp-issues-detention-order-seafood-harvested-forced-labor.

conditions." U.S. Customs and Border Prot., CBP Issues Detention Order on Seafood Harvested with Forced Labor (Aug. 18, 2020), https://www.cbp.gov/newsroom/national-media-release/cbp-issues-detention-order-seafood-harvested-forced-labor-0. The Order required the detention of all seafood harvested by the *Da Wang* at all U.S. ports of entry.

53.    CBP has issued repeated warnings about forced labor in the global tuna supply chain. For example, in a 2020 press release announcing the detention of tuna from a Taiwanese vessel, CBP counseled that "Americans need to know that tuna and other seafood products can be at high risk of being harvested by forced labor, which is a form of modern-day slavery."[5]

54.    Similarly, in a 2021 press release announcing the detention of tuna from a Mainland Chinese distant-water fleet, CBP warned, "The distant water fishing industry is at high risk of forced labor as foreign companies often coerce vulnerable migrant workers to perform hazardous labor for little or no pay aboard distant water fishing vessels that may spend months at sea without making port calls."[6]

55.    The Maritime SAFE Act, part of the National Defense Authorization Act for Fiscal Year 2020 (Public Law 116–92, Title XXXV, Subtitle C, § 3563), directed the Departments of Commerce and State to draft a report to Congress on human trafficking in the seafood supply chain.

56.    That report found that

> The PRC [People's Republic of China] is a significant offender in the use of forced labor in their fishing sector, with numerous reports known on Chinese-flagged and -owned vessels throughout the world . … The majority of the crews on board are migrant workers from Indonesia and the Philippines but have also been noted from Africa

---

[5] U.S. Customs and Border Prot., CBP Issues Withhold Release Order on Seafood Harvested with Forced Labor by Lien Yi Hsing No. 12.

[6] U.S. Customs and Border Prot., CBP Issues Withhold Release Order on Chinese Fishing Fleet (May 28, 2021), https://www.cbp.gov/newsroom/national-media-release/cbp-issues-withhold-release-order-chinese-fishing-fleet.

13

and other Asian countries. According to the media, governmental and non-governmental reports, there have been numerous incidents of forced labor reported on Chinese fishing vessels. Workers report excessive working hours, poor living conditions, isolation at sea for months to years, verbal and physical abuse, nonpayment of wages, document, and debt bondage. Deaths have occurred as the result of abuse on these vessels. Workers are sometimes recruited by agencies that use deceptive tactics regarding their wages and contracts, and they are often required to pay recruitment fees and sign debt contracts.

Dep't of Commerce and State, Report to Congress: Human Trafficking in the Seafood Supply Chain Annex 1 (2020).

57.     The report found that Taiwan also

has a significant problem with forced labor in its fishing fleet… There are reports of forced labor on Taiwan boats throughout the world. Documented and undocumented PRC, Indonesian, Filipino, and Vietnamese fishers working on Taiwan-owned and -flagged fishing vessels experience non-or under-payment of wages, long working hours, physical abuse, lack of food or medical care, retention of identity documents, denial of sleep and substandard safety equipment, and poor living conditions. Workers have died as a result of the abuses that occur onboard. The abuses are particularly prevalent in Taiwan's distant water fleet.

*Id.*

58.     In 2021, the U.S. Trade Representative submitted a proposal to the World Trade Organization to address forced labor on distant-water vessels.

**International organizations, non-government organizations and the media have reported on forced labor in the longline tuna fishing industry**

59.     The U.S. government is not alone in raising alarm bells about forced labor on distant-water fishing vessels. For the past 20 years, the distant-water fishing industry has come under intense scrutiny from the ILO, the United Nations, NGOs, and the media for endemic forced labor within the industry.

60.     For example, a 2013 report by the International Labour Office found that, although forced labor in the fishing industry was not a new problem, "the changes in

14

the fisheries sector in recent years, combined with increased globalization, competition, and the mobility of migrant workers, have probably exacerbated the problem." The report highlighted problems with deceptive recruiting and with distant-water fishing vessels remaining in remote locations for years at a time.

61.     Since 2013, forced labor and related abuses in the distant-water fishing industry have been the subject of dozens of public reports and other publications by nongovernmental organizations, including several Greenpeace entities, the Environmental Justice Foundation, Global Labor Justice – International Labor Rights Forum, the Business and Human Rights Resource Centre, OCEANA, C4ADS, Human Rights at Sea, the International Catholic Migration Commission, Global Fishing Watch, the Fisheries Research Institute, Verité, SeaAroundUs, BLOOM Association, and Shark Guardian.

62.     For example, in 2013 Greenpeace International released a report entitled "Out of Line: The Failure of the Global Tuna Longline Fisheries" that included a discussion of the prevalence of forced labor in the tuna industry. The report recounts the lack of oversight on distant-water longline vessels, which can stay for years at a time on the sea through transshipment, resulting in isolating conditions for migrant workers who cannot escape abusive conditions. The report discussed case studies of two Taiwanese-owned longliners, on which fishers alleged abusive conditions, including, but not limited to, the physical restraint of fishers who asked to leave, physical abuse, beatings, and insufficient food and water.

63.     In 2016, Greenpeace East Asia (Taipei Office) released a report entitled "Made in Taiwan" that detailed forced labor and other illegal practices in the Taiwanese distant-water fishing industry. For the report, Greenpeace East Asia (Taipei Office) conducted interviews of victims as well as advocates and academics who had studied forced labor in the industry, which showed a pattern of endemic forced labor throughout the industry. The report alleged that migrant workers on Taiwanese distant-water fishing vessels described regularly "not being paid by their agent or captain, being debt

bonded, receiving very low pay rates, having their pay heavily reduced by exorbitant fees, and living in horrific conditions," all while working up to 22 hours a day for months straight. The report described how the practice of transshipment enables these abuses by leaving fishers "at sea for months at a time with no oversight from authorities."

64.    Greenpeace USA emailed a link to the "Made in Taiwan" report directly to Bumble Bee's then-CEO Chris Lischewski. Lischewski replied, "As for the report on Taiwan, I have printed it but have not yet taken the time to read it. It is not high on my priority list."

65.    Many of these reports have recounted evidence that migrant fishers, especially from Indonesia and the Philippines, are often lured into work on distant-water fishing vessels by recruiters, who mislead the fishers as to the salary they will receive and other terms of their employment before charging them excessive fees that trap the fishers in debt bondage.

66.    Other forced-labor indicators frequently highlighted in these reports include excessive deductions that leave fishers stuck in debt and with little, if any, take-home pay; "very low" pay rates; wage theft; workdays exceeding 20 hours or more; lack of access to medical care, adequate food, sleeping accommodations, and safety equipment; and frequent verbal and physical abuse.

67.    These reports and publications often specifically highlighted the problem of forced labor and/or human trafficking on Mainland Chinese or Taiwanese distant-water fishing vessels.

68.    Dating back more than a decade, allegations of forced labor and related abuses have also been regularly appearing in articles published by major media organizations across the globe, including the AP, the New York Times, the Los Angeles Times, the New Yorker, the BBC, the Guardian, the Diplomat, and the South China Morning Post, among others.

69.    For example, in 2015, the AP published the results of a year-long

investigation under the title "AP Investigation: Are slaves catching the fish you buy?" The AP reported on evidence of workers in the fishing industry being subject to labor abuses, including being forced to work 20-to-22-hour shifts for little or no pay and being subject to beatings, whippings, and other acts of physical abuse. The article concluded that seafood produced with forced labor was being exported to the United States market.

70.    The AP contacted "major corporations" for comment on the story, though none commented on the record. A spokesperson for one seafood importer commented, "We are all aware of it," referring to seafood produced with forced labor being imported into the United States.

71.    The AP investigation won the 2016 Pulitzer Prize for public service.

72.    In 2016, the New York Times published a six-part investigative series entitled Outlaw Ocean that shed light on forced labor and human trafficking on commercial fishing vessels operating on the high seas. The series included articles entitled "'Sea Slaves': The Human Misery That Feeds Pets and Livestock" and "Tricked and Indebted on Land, Abused or Abandoned at Sea," the latter of which detailed the 2011 death of a fisher upon a Taiwanese tuna vessel. The fishers on that vessel had been promised double their actual wages and then were subject onboard to 20-hour workdays, beatings, and sexual abuse, and ultimately returned home unpaid and thousands of dollars in debt.

73.    Another article in the Outlaw Ocean series referred to Taiwanese tuna longliners as among "the most violent and dangerous ships" and recounted how migrant workers are funneled to these ships through labor brokers that used deceptive tactics to induce the workers to sign exploitative contracts.

74.    Other articles likewise reported on allegations of deceptive recruiting tactics, debt bondage, physical abuse, wage deductions and theft, and lack of access to medical care, adequate food, and safety equipment.

75.    Numerous articles, including those in the AP, the New Yorker, the Guardian, the CBC, the National Fisherman, and the English-language Jakarta Post and

FIRST AMENDED COMPLAINT

Case No. 3:25-cv-00583-BAS-DEB

Taipei Times, recounted harrowing tales of Indonesian migrants who paid recruitment fees for jobs on distant-water fishing vessels, where they were subject to conditions indicative of forced labor, including excessive workdays, verbal and physical abuse, and unsafe working conditions.

76.    For example, a 2016 article in the Guardian reported on charity workers in Cape Town who would help rescue migrant fishermen trapped in forced-labor conditions on vessels that dock there. The article reported that migrants from Southeast Asia were often deceived into believing they would make good wages on fishing vessels but instead spent "months at sea with little food and drinking water, working 16- to 24-hour days, for salaries that are frequently unpaid." The article gave an example of 70 Indonesian fishermen who had been found living in squalid conditions onboard vessels docked at Cape Town. After they were sent back to Indonesia, the Guardian reported that some were pursued by their labor recruiters for the debts they owed for breaking their contracts.

77.    As another example, in 2020 multiple major media organizations across the globe reported on a voyage of the *Long Xing 629*, a Mainland Chinese tuna longliner, during which four Indonesian migrants died. The surviving fishers said they had been recruited from a small Indonesian village with the promise of high wages, but they were paid less than promised and were also charged a "security deposit" and undisclosed recruitment fees, which they were told they would need to work off. Once onboard, the fishers were forced to work 18-hour days, subject to physical abuse, and given inadequate food and water.

**Allegations of forced labor in Bumble Bee's supply chain have been publicly reported**

78.    Allegations of forced labor in Bumble Bee's supply chain have been publicly reported and are known to Bumble Bee.

79.    In 2016, Greenpeace USA released a report entitled "Sea of Distress," which analyzed American food companies' connections to labor abuses and illegal

18

fishing in the seafood supply chain and rated them on social responsibility. Bumble Bee received a failing grade, and the report warned that tuna consumed in the United States was potentially linked to "forced labor and egregious human rights abuses." The same report also recounted allegations of forced labor on tuna vessels, including debt bondage, workdays up to 22 hours, wage theft, physical abuse, and violence, and it highlighted the role transshipment plays in enabling these abuses.

80.    In May 2018, Greenpeace East Asia (Taipei Office) published a report entitled "Misery at Sea" recounting three case studies of labor abuses on distant-water tuna vessels. The report alleged that FCF had been supplied by vessels that worked with Giant Ocean, a Taiwanese recruiting agency whose directors were criminally charged with human trafficking by Cambodian authorities. FCF president Max Chou publicly responded to this report.

81.    In December 2019, Greenpeace Southeast Asia and the Indonesian Migrant Workers Union ("SMBI") published a report entitled "Seabound: The Journey to Modern Slavery on the High Seas" that detailed the debt bondage faced by Indonesian and Filipino migrant fishers on Mainland Chinese and Taiwanese distant-water tuna vessels. The report summarized the typical pattern:

> In Indonesia, the story generally begins with a manning agency recruiting migrant fishers. Workers have to pay guarantee deposits to foreign brokers and processing fees to Indonesian manning agencies for the first six to eight months of their 24-month contract – often, a third of their salary is deducted to pay for debts incurred in the recruitment process.

The report notes that if a fisher leaves before the end of the contract, he forfeits the guarantee deposit and must shoulder all charges, including plane tickets, resulting in little or no pay – essentially ensuring the fisher cannot quit. In an analysis of 13 Mainland Chinese, Taiwanese, and Fijian distant-water tuna vessels, Greenpeace Southeast Asia and SBMI found evidence that fishers on 11 of the vessels had been victims of deceptive recruiting; fishers on nine of the vessels had been victims of wage

FIRST AMENDED COMPLAINT

1    withholding; fishers on eight of the vessels had been subject to excessive overtime; and

2    fishers on seven of the vessels had been victims of physical or sexual abuse. At least

3    two of the vessels discussed in the analysis, the *Da Wang* and the *Lu Rong Yuan Yu 30*,

4    have supplied Bumble Bee with albacore tuna.

5        82.    In March 2020, Greenpeace East Asia (Taipei Office) released a report

6    entitled "Choppy Waters: Forced Labour and Illegal Fishing in Taiwan's Distant Water

7    Fisheries," recounting case studies of forced labor on Taiwanese fishing vessels. For

8    one of the case studies, Greenpeace East Asia (Taipei Office) interviewed a fisher who

9    was recruited through an Indonesian manning agency to work upon the *Wei Ching*,

10   which supplied FCF, Bumble Bee's parent company and primary supplier. The fisher

11   reported that he was subject to salary deductions, made to work on average 18 hours a

12   day, was provided with inadequate food, sleeping accommodations, and safety

13   equipment and was denied medical care. Greenpeace East Asia (Taipei Office) gave

14   FCF an opportunity to comment on the report before its publication and sent FCF a copy

15   of the report upon its release.

16       83.    A March 2020 online post entitled "Why Bumble Bee Tuna Should

17   Concern You (Hint: It's Human Rights and Destructive Fishing)" recounted

18   Greenpeace East Asia (Taipei Office)'s findings that suspected forced labor was

19   occurring on vessels that supplied FCF and that Bumble Bee sources 95% of its albacore

20   tuna from FCF, and it recommended Bumble Bee improve labor rights in its supply

21   chain by changing its policy of sourcing from longliners and vessels that use

22   transshipment and to upgrade its human-rights policy for vessels to match international

23   labor standards.

24       84.    Greenpeace USA emailed a link to the "Choppy Waters" report and the

25   post to Bumble Bee executives Mike Kraft and Kevin McClain. Mr. Kraft responded

26   with an acknowledgement that FCF and Greenpeace East Asia (Taipei Office) had been

27   in communication regarding the issues discussed in the report.

28       85.    On August 18, 2020, CBP issued a withhold release order against tuna

20

harvested by the *Da Wang*, a Taiwanese distant-water fishing vessel that supplied Bumble Bee, citing evidence that the tuna had been harvested using forced labor "including physical violence, debt bondage, withholding of wages, and abusive living and working conditions."[7]

86.     Bumble Bee was aware of this Order. In response, Bumble Bee and FCF issued a joint statement, also in August 2020, which conceded "that significant progress must be made to ensure responsible labor practices are followed on all tuna vessels."

87.     CBP followed up its withhold release order with a formal "finding" concluding "that certain seafood has been harvested by the *Da Wang* fishing vessel with the use of convict, forced or indentured labor, and is being, or is likely to be, imported into the United States."

88.     Bumble Bee was aware of the CBP actions with respect to the *Da Wang*.

89.     On March 12, 2021, Greenpeace USA delivered a petition containing almost 27,000 signatures to Bumble Bee's headquarters in San Diego, calling for Bumble Bee to upgrade its human-rights policy for tuna vessels to reflect international standards and to protect fishers from human rights abuses. Greenpeace USA also emailed the petition to Bumble Bee four days later.

90.     On May 31, 2021, Greenpeace Southeast Asia and SBMI released a report summarizing complaints they had received from Indonesian migrant workers against 10 tuna longliners for abuses indicative of forced labor. Two of the longliners, the *Da Wang* and the *Lu Rong Yuan Yu 139*, have supplied Bumble Bee with albacore tuna.

91.     On February 21, 2022, Global Labor Justice – International Labor Rights Forum filed a lawsuit against Defendant Bumble Bee in the District of Columbia Superior Court alleging that Bumble Bee violated the D.C. Consumers Protection

---

[7] U.S. Customs and Border Prot., CBP Issues Detention Order on Seafood Harvested with Forced Labor (Aug. 18, 2020), https://www.cbp.gov/newsroom/national-media-release/cbp-issues-detention-order-seafood-harvested-forced-labor-0.

Procedures Act by claiming that its tuna was produced with "fair and responsible working conditions" "when, in fact, Bumble Bee sells tuna products caught by laborers who are subjected to inhuman conditions."[8]

92.    Bumble Bee settled that lawsuit in March 2023 by agreeing to remove the statements "fair and safe supply chain" and "fair and responsible working conditions" from its marketing materials and to refrain from making such claims for a period of 10 years.

93.    In September 2022, Greenpeace East Asia (Taipei Office) published a report entitled "Fake My Catch," which specifically linked Bumble Bee to tuna produced with forced labor and criticized Bumble Bee for taking insufficient steps to prevent forced labor in its supply chain. As part of its investigation, Greenpeace East Asia (Taipei Office) and Greenpeace USA had volunteers locate cans of Bumble Bee albacore tuna for sale on retail shelves in U.S. grocery stores and used Bumble Bee's "Trace My Catch" tool to identify the vessels that harvested the albacore tuna in each can. The investigation found that Bumble Bee retailers were selling tuna harvested by the *Da Wang* as late as April 2022, despite CBP's August 2020 withhold release order. It also identified tuna in Bumble Bee cans containing tuna from to six other vessels linked to allegations of forced labor. The investigation concluded that Bumble Bee was taking insufficient measures "to ensure that Bumble Bee tuna products do not involve IUU [illegal, unreported and unregulated fishing] and forced labor."

94.    Greenpeace USA provided Bumble Bee with an opportunity to comment on the "Fake My Catch" report before its publication.

95.    On July 12, 2023, Greenpeace USA directly contacted representatives from Bumble Bee via email and invited them to discuss potential improvements to Bumble Bee's human rights policies. Bumble Bee declined the invitation.

---

[8] *Int'l Lab. Rts. F. v. Bumble Bee Foods, LLC*, Complaint at ¶ 79 (D.C. Super. Ct. Mar. 21, 2022).

## The Plaintiffs' Ordeals

### Akhmad

96.    Akhmad had never traveled outside Indonesia when he applied to work on a tuna fishing vessel. He lived in rural Java and had left school at age 15 to help support his family. He worked in construction, farming and other jobs. By 2020, he was married with two children and wanted to earn a better living to provide for his family.

97.    Akhmad submitted his identity documents to the manning agency which helped him obtain a passport, seaman's book, and a visa. The agent told him the recruitment and administrative costs would be deducted from his salary. Akhmad waited months before he was assigned to a fishing vessel. The agent gave him a contract to sign just prior to his departure and rushed him to sign it as there was a long queue of men present and waiting behind him.

98.    Akhmad's contract provided for a salary of $300 per month. But approximately $200 a month was deducted for the first eight months (one third of the contract period) to repay recruitment and administrative costs along with another deduction of $50 per month for living costs while on board. As a result, he was only earning $50 a month to support his family. In addition, Akhmad learned that his family would be subject to punishment if he left the ship early. He knew that his family could not afford to repay the fees and fines.

99.    Once on board, Akhmad worked 18 hours per day, 7 days per week. Once a month, the crew had a "break day."  On that day, they worked only 10 or 12 hours. During break day, the crew fixed hooks, cleaned the freezer, and performed other maintenance. During his entire time aboard, Akhmad only had New Years off.

100.    The captain and the senior crew abused the fishers. The captain beat Akhmad and the other workers, including with a metal hook. The mandor beat Akhmad and the other crew members about the head, stopping when he drew blood. Akhmad was hit too often to count.

101.    The work was physically demanding and hazardous. Akhmad was

23

provided rudimentary protective equipment, but when that wore out or broke, he was not provided a replacement.

102.   The workers did not receive needed medical attention for their injuries. Akhmad was seriously injured twice while hauling fish on board. One time, the rope holding the weighing gear broke, dropping a load of fish on Akhmad. Akhmad's leg was gashed open from mid-shin to thigh. The captain ordered Akhmad to keep working, although the blood kept gushing. Akhmad thought his boot was full of water, but soon realized that blood, not water, was filling his boot. The captain allowed Akhmad to sit down, at which point Akhmad realized the gash was so deep, he could see the bone in his leg. Akhmad was left to clean and bandage his leg himself, without sterile medical supplies. His leg bled for two weeks and he is still in pain, years later.

103.   Injuries were common. Three fishers had to have their fingers amputated after working too long in the freezer during the fish unloading process. Later, Akhmad suffered a similar injury: while he was hauling fish, a rope sliced the top of his finger off. He was put back to work although he was still in great pain and had not received medical attention.

104.   In addition, the conditions on board were harsh. For example, the food was inadequate, and the men frequently went hungry.

105.   Akhmad was afraid to leave because he knew that quitting put his family at risk. Nonetheless, eventually, he and a fellow fisher asked the captain to go home. The captain responded with a threat, "If you want to go home, you can swim in the ocean."   Desperate, Akhmad asked to leave on one of the transshipment vessels that periodically arrived to collect their catch. The captain refused. The captain told him to wait until the ship docked at port, but the vessel did not go to port. Instead, transshipment vessels traveled to the ship to bring supplies and offload the fish.

106.   Ultimately, Akhmad was able to get word to his wife, who contacted the Indonesian Migrant Workers' Union, SBMI. When the vessel finally docked in Fiji in March 2023, SBMI worked with IOM and the local police to obtain Akhmad's release,

as well as the release of his fellow fishers. When it was time for Akhmad's departure, the captain told Akhmad he still owed the captain $30.00.

### Angga

107.    Angga grew up in rural Java. He had never before traveled outside of Indonesia when he applied to work in 2020 on a tuna fishing vessel for a salary of $700 per month. The manning agency told him that the vessel would dock every three months and that he would get paid at that time: $50 on board and the remainder to be sent home to his chosen bank. He provided his brother's bank account information for receipt of the salary.

108.    In order to obtain the job, Angga deposited his identity documents, including his government ID card with the manning agency. At the agency, Angga obtained a medical check-up, a passport, and a seaman's book and took a basic safety training class. No itemized costs were provided to him. Angga waited about a year before he was assigned to a vessel.

109.    Angga was lined up with other workers and rushed through the contract signing. Instead of the promised $700 a month, the contract provided he would get only $300 a month – less than half of what he had been promised. He also learned that $250 a month would be deducted for the first six months for the onboarding expenses, leaving him with only $50 in salary.

110.    The contract also provided for a $1,000 guarantee to be forfeited if the two-year contract was not completed as well as a penalty to be levied against Angga's family:

> I understand that if I abscond while abroad, the Indonesian agency has the right to demand my family pay a fine for the costs incurred as a result of my escape …. If my family is not willing to pay the fine, then the Indonesian agency can prosecute my family in accordance with applicable law.

111.    Angga was required to sign a supplemental letter which provided for the provision of a service fee to guarantee his "seriousness" and consented to his family

1    paying a $2,000 penalty if he worked for less than one year.

2         112.    Angga went to sea on the promised vessel, the *Lu Rong Yuan Yu 268*, but
3    once they reached the fishing grounds, he was transferred to another vessel that was
4    already there, the *Lu Rong Yuan Yu 878*, along with one other crew member.

5         113.    The conditions on the *Lu Rong Yuan Yu 878* were harsh and abusive.

6         114.    Angga shared a bunk with another fisher because there were not enough
7    bunks.

8         115.    The food provided was inadequate and Angga was often hungry. Breakfast
9    was often just rice with soy sauce. At lunch, vegetables were added. Every four months,
10   after a big load of fish was moved to the collecting vessel, the fishers were given a meal
11   with chicken. Sometimes the men resorted to eating the bait used for catching fish.

12        116.    The captain hit the fishers, often about the head, and kicked them. He hit
13   Angga hard enough that his head hurt all day and he'd end up with a bump on his head.
14   The captain also punched the fishers, including Angga, with a needle. The jab felt like
15   a shot. The captain stabbed Angga in the buttocks and the shoulder, often two or three
16   times per week. Angga saw the other fishers get stabbed as well, creating a climate of
17   fear. One time, Angga saw another fisher getting stabbed, so he ran away, but the
18   captain chased him holding the needle. Sometimes the fishers were stabbed while asleep
19   in their bunks.

20        117.    The fishers discussed their plight and repeatedly asked to leave the vessel.
21   The first time they asked, the captain told them to keep working. They asked again and
22   again. Eventually, the men banded together and joined in a work stoppage. The captain
23   asked them, "You go home? You go home?"  They answered, "Yes, Yes."

24        118.    After the work stoppage, the captain increased his physical abuse of the
25   men, but after roughly two more months, they were permitted to go home.

26        119.    When Angga returned home, he learned that no money had been
27   transferred to his brother's account, the bank account he had provided to receive his
28   salary payments. As a result, his family received no salary at all for his forced labor at

FIRST AMENDED COMPLAINT
Case No. 3:25-cv-00583-BAS-DEB

sea.

## Muhammad Sahrudin

120.  Muhammad Sahrudin's family was very poor and lived in a rural area. M. Sahrudin is the oldest of eight children. He left school after sixth grade to help support his family. He worked in the fields, returning to cook for his siblings to ensure they had enough to eat.

121.  Sahrudin borrowed money from his mother to pay the recruitment fee to a manning agency. His mother was in the hospital at the time and had to sell her jewelry to raise the funds, so Sahrudin felt under pressure to obtain the job and make it work. He promised to repay his mother.

122.  Sahrudin deposited his identity papers with the manning agency, which helped him obtain a passport and seaman's book. He also attended a basic safety training session and obtained a medical check that required staying out of town, in a boarding house, a cost that was added to the amount he owed to the agency.

123.  After a four month wait, the agency notified Sahrudin that he was assigned to a fishing vessel and called him in, along with several other men, to sign a contract. The men were rushed through the contract signing process. Sahrudin felt pressure to sign the contract. He was told that if he declined, he would have to pay for the cost of the medical check, training, and other expenses.

124.  Sahrudin was given a series of additional letters to sign. One provided that he was to repay $700 through salary deductions. Another provided that if he terminated his contract, he would pay $20,000 – a huge sum – as a penalty and be responsible for all costs incurred by the recruitment agency. The size of the penalty took Sahrudin aback, but he had already borrowed funds from his mother for the job and felt compelled to continue. That afternoon, he was taken to the vessel.

125.  The conditions on board the *Lu Rong Yuan Yu 878* were harsh. The food was like food for ducks. The fishers were provided a meal that included meat only once every three months. Otherwise, they subsisted on rice and some vegetables.

126.  The men worked long hours, roughly 12 hours a day, seven days a week. There was no break day. They did not even have time off for religious observances or space for prayer.

127.  The fishers were subjected to physical abuse by the captain. The captain would slap the crewmen with his hand, hit them about the head, and, worse, stab them with a needle. Sahrudin was beaten so many times, he cannot recall the exact number. One time, the captain chased him with the needle, while Sahrudin begged to be spared. Sahrudin suffered nightmares about the chase. When the captain stabbed the fishers, he would jab up to three times. The wounds bled and often got infected, leading to pus and swelling.

128.  Sahrudin was also whipped. He was lashed on his back, with the main line, as were other fishers.

129.  There was no respite from the violence on board. The crew shared their experiences and decided to leave. The men requested to leave several times, but were refused, even though supply ships came and went.

130.  Eventually, they decided to stay in their quarters and refused to work. When the captain came by, they responded "go home, go home." Their joint action was ultimately successful, and the men were permitted to go home.

131.  In the end, Sahrudin did not earn any money from his forced labor at sea.

**Muhammad Syafi'i**

132.  Muhammad Syafi'i grew up in a rural area and began working when he was 18 years old. In 2021, M. Syafi'i sought work overseas. He had never traveled outside Indonesia and had only completed the ninth grade. After visiting a manning agency, he received an offer to work as a cook on a fishing vessel. He submitted his identity documents to the manning agency. The manning agency also assisted him in obtaining a passport, a medical exam and a basic training certificate (although the agency never sent him to a basic training class).

133.  After a couple months wait, he was told that he was assigned to a vessel.

On the morning before his noon flight out, he was presented with a contract to sign. He was in a group of 40 men waiting to depart and they all felt rushed to sign. At that time, he learned that $170 per month would be deducted each month from his pay for the first five months. He also learned that he would have to deposit $100 a month for 10 months as a guarantee that he would finish his contract term and that he would only be paid the "guarantee" portion of his salary if he finished the two year contract. Finally, he was told that if he refused to sign, he would have to pay a penalty of $850.

134.   Once on board, Syafi'i worked long hours. There were times Syafi'i was only able to sleep 3 hours a day. He was ordered to cook two different meals at each mealtime. He would cook one meal, for example with chicken or duck, for the captain and Chinese crew. The Indonesian fishers would get different, inferior food.

135.   In addition to his work as a cook, Syafi'i was assigned fishing work. He threw bait and pulled fish into the vessel. He was also responsible for laundering the captain's clothes every day, after he finished his other work.

136.   The work was physically demanding and hazardous. Syafi'i was not provided adequate protective equipment. If a worker wanted a raincoat, gloves, or boots, the cost would be deducted from their salary.

137.   The food provided was inadequate. Often, the food the fishers were given was expired. They were so hungry that they resorted to eating the bait fish, including bait fish that he could tell was old. Several of the workers became ill from the lack of fruits and vegetables.

138.   The captain and the senior crew abused Syafi'i and the other workers, including by beating them. Syafi'i was regularly beaten by the captain.

139.   The fishers did not receive medical attention for their injuries. Syafi'i was severely burned when he was working in the kitchen. Hot cooking oil splashed all over his stomach, groin, and down his legs, resulting in severe burns over much of his lower body. The burns were the most pain he had ever experienced. He felt like his genitals exploded. His wet clothing stuck to his skin. He screamed in pain, but when the crew

rushed to see what had happened, the captain told them to leave him be and to get back to work. Syafi'i was left lying on the kitchen bench, alone. His skin swelled, popped, and turned white. He was unable to go to the bathroom and was not fed. His fellow fishers secretly brought him water to drink when the captain was not around.

140.    No medical treatment was provided. There were no sterile medical supplies or pain relievers available. Syafi'i crawled, despite the severe burns on his hands and knees, to his bunk to get some Vaseline he had brought on board. He was left to treat the burn himself, by dabbing his skin with Vaseline. Doing so was so excruciatingly painful; he is surprised he survived.

141.    Despite his injuries Syafi'i was put back to work. When he did not die, the captain told him to get back to work. The captain also told him, if he did not work, he would have to pay for his meals and bed. At the time he was put back to work, the burns were still so bad, he was unable to put on clothes. Syafi'i resorted to going back to work wearing a sarong instead of trousers.

142.    Syafi'i repeatedly asked to go home but was not allowed to leave the ship. At one point, he asked to leave almost every day. During the time he was requesting to leave, the ship rendezvoused three times with a transhipper or collecting vessel. One time, another worker had died on board, and his body was picked up by a collecting vessel. However, Syafi'i was not permitted to leave with the collecting vessel.

143.    Even after Syafi'i suffered the burns, the captain continued to beat him. Syafi'i was kept on board against his will for a year after the accident.

144.    Syafi'i suffered permanent injury as a result of the lack of medical care.

145.    All of the Plaintiffs suffered physical abuse and injury on board.

146.    All of the Plaintiffs suffered emotional distress, which is continuing.

**Bumble Bee Collaborates with FCF and Vessel Owners to Harvest Tuna**

147.    Bumble Bee is one of the top canned albacore tuna brands in the United States, with a 41% share of the market in 2019.

148.    FCF is an integrated supply chain management company.

First Amended Complaint

Case No. 3:25-cv-00583-BAS-DEB

149.   A Bumble Bee executive described the Bumble Bee - FCF relationship as "an integrated partnership" with "shared goals and objectives" and "common work plans."

150.   FCF described the relationship as "a longstanding partnership in raw material supply and processing" that included Fisheries Improvement Projects for tuna longline fisheries.

151.   Bumble Bee has obtained almost all of its albacore from FCF for years, dating back to at least 2010. In 2019, Bumble Bee's then-CFO testified that FCF supplied between 95% to 100% of Bumble Bee's albacore tuna.

152.   FCF purchased Bumble Bee in 2020. Bumble Bee has been a wholly-owned subsidiary of FCF since that time.

153.   FCF claims to provide "the planning and management of all activities involved in sourcing and procurement, conversion, and all logistics management activities" for both Bumble Bee and the vessel owners. In its own words, FCF is "a vertically integrated global organization with a network of strategically located, owned and contract tuna processing plants, commercial offices, fishing fleets and supply assets."

154.   FCF's services for the vessel owners include providing finances for vessel purchase or construction; obtaining licenses, quota and crew; supplying fuel, bait and provisions; and arranging transshipments at sea. The transshipments include both supplies of fuel and provisions and offloading catch.

155.   FCF has provided Bumble Bee with over one hundred million dollars in financing.

156.   Bumble Bee and FCF have shared executives and employees at the highest level. Until recently, Bumble Bee's acting CEO was Jerry Chong-Yih Chou, who also served as FCF's manager of special projects, and was a member of one of FCF's controlling shareholder families and the brother of FCF CEO Max Chou. Jerry Chou remains chairman of Bumble Bee's board of directors.

FIRST AMENDED COMPLAINT

157.   Ray Clarke holds positions at both companies as the Vice President of Governmental Affairs and Fisheries Management for Bumble Bee and the Advisor to the President at FCF, where he has "direct access to the senior leadership of FCF."

158.   Bumble Bee and FCF have undertaken joint government and public relations efforts to protect their joint business, including from further scrutiny and regulation of labor practices. For example, (A) they released a joint statement about alleged forced labor on the *Da Wang* following the Department of Labor's 2020 Withhold Release Order; (B) Bumble Bee contacted a foreign government on behalf of itself and FCF, to facilitate implementation of its joint Fishery Improvement Projects and (C) Bumble Bee and FCF appear to have routinely issued joint press releases and statements, including their Seafood Future Report on sustainability and social impact.

159.   Bumble Bee has closely collaborated with FCF for decades, including prior to Bumble Bee's purchase by FCF.

160.   Bumble Bee's collaboration with FCF has strengthened since FCF purchased Bumble Bee. Bumble Bee has collaborated closely with its parent company, FCF, and other venture participants to ensure it receives the supply of canning-grade albacore tuna it needs to meet its customers' demand in the United States.

161.   Bumble Bee and FCF have worked together to operate a network of processing plants, supply ships, transshipment vessels, and longline fishing vessels, including the vessels where Plaintiffs were subjected to forced labor. They operated this network in order to import tuna into the United States at reduced costs and increased profits.

162.   For example, Bumble Bee and FCF jointly contracted with processing plants located around the globe. FCF supplied the processing plants with raw tuna. The processing plants then processed and shipped the tuna exclusively to Bumble Bee canning facilities.

163.   Prior to processing, the fish underwent a quality protocol to ensure it met Bumble Bee's specifications.

164.   In 2005, Bumble Bee and FCF entered a joint agreement with the Thon des Mascareignes ("TDM") tuna processing plant in Mauritius under which FCF would serve as TDM's exclusive raw albacore supplier and TDM would exclusively sell the processed albacore to Bumble Bee. In addition to purchasing processed albacore tuna from TDM, Bumble Bee provided TDM with technical and quality assistance. Bumble Bee also assisted TDM with securing the FDA certifications necessary to process tuna for sale in the United States. TDM merged into Princes Tuna (Mauritius) in 2014, which continues in this role.

165.   Bumble Bee and FCF similarly collaborated to source tuna through the Pacific Fishing Company ("PAFCO") processing plant in Levuka, Fiji. Bumble Bee has been the exclusive purchaser of albacore tuna processed at PAFCO since 2001. Bumble Bee is also involved in management, production, and oversight at the PAFCO facility. Indeed, Bumble Bee employs its own onsite quality control manager at the facility. Bumble Bee also sourced raw albacore tuna for PAFCO. Bumble Bee sourced this tuna exclusively through FCF.

166.   Bumble Bee and FCF also partner with the Barana Seafood Processors, Ltd., in Trinidad. Bumble Bee and Barana entered an agreement in 2001 for Barana to construct a tuna processing facility according to Bumble Bee's specifications, under which Barana would process tuna for Bumble Bee under Bumble Bee's supervision and management. Bumble Bee conditioned its agreement with Barana upon execution of a supply contract with FCF for raw albacore.

167.   Bumble Bee and FCF have relied on a fleet of longliner tuna vessels to supply their albacore tuna.

168.   FCF has sourced the tuna it sends to the processing plants from boats owned by a trusted network of boat owners.

169.   FCF actively fostered and maintained long-term relationships with what it calls its "trusted network of boat owners." FCF explains that "fostering long-term relationships and partnerships" with vessel owners is one of its "core business

33

philosophies."

170.   Bumble Bee has relied on FCF and that "trusted network of boat owners" to meet Bumble Bee's albacore tuna supply.

171.   At the same time, FCF and Bumble Bee provided the vessel owners with a consistent and reliable buyer for their product. The vessel owners also received logistical support and services that increased the efficiency and profitability of their operations.

172.   The success and failure of all members of the venture are closely intertwined and rise and fall together. Bumble Bee relies on the successful harvest from the tuna vessels for the cost-effective albacore tuna supply needed to meet its demand. The vessels rely upon Bumble Bee's sales to American consumers to create a vast market for albacore tuna that the vessels supply and on FCF's transshippers and other services to ensure that the vessels can remain at sea, fully staffed.

173.   The operation of the trusted vessel network is mutually beneficial. It allows Bumble Bee and FCF to maintain a reliable and consistent source of raw material to meet consumer needs. For example, FCF touts that it "has the largest fleet of associated fishing vessels and therefore can provide uninterrupted supply of raw materials." Bumble Bee has boasted to potential investors that Bumble Bee is "the only company to have direct access to raw materials in each of the major oceans, allowing us to take advantage of higher catches and lower prices available in the world's largest fishing regions." The long-term partnership with a trusted vessel network also gives Bumble Bee and FCF influence over the vessels' fishing practices.

174.   FCF has provided what it calls "turn-key" services for its trusted network of boat owners. These services include "vessel building financing, provisions, bunkering [supplying fuel], marketing, repairs and maintenance, and compliance with the international marine regulations and regional marine resource conservation measures."

175.   The turn-key services FCF has supplied to its trusted network of vessel

34

1    owners are critical to the vessels' abilities to embark on distant-water voyages.

2        176.    Vessel owners relied on FCF to arrange transshipment services for them to

3    be refueled and resupplied with other necessities while their vessels operate at sea.

4        177.    FCF has employed more than 20 oil tankers that serve vessels "anywhere

5    anytime," thus enabling them to stay at sea for longer periods of time.

6        178.    Vessels also relied on FCF to transport their catch to port.

7        179.    FCF arranged transshipments for distant-water fishing vessels through a

8    network of more than 30 carriers that will meet the distant-water fishing vessels at sea

9    to transport their catch to port.

10       180.    Transshipment allows fishing vessels to stay at sea longer, away from

11   oversight, keeping their crew at sea, and efficiently offloading their catch while

12   mingling catch from multiple vessels and reducing transparency. This gives vessels that

13   utilize transshipment an economic advantage.

14       181.    FCF often sent its own representatives to accompany the carriers during

15   these transshipments.

16       182.    Arranging for transshipment can be expensive and time-consuming for

17   vessel owners, making those who utilize transshipment reliant on FCF to provide this

18   service.

19       183.    FCF has performed a wide range of services for the vessels beyond

20   transshipment.

21       184.    FCF has provided fishing baits and gears, bunkering and carrier services

22   around the world, and outreach and training sessions with vessel owners "for sustainable

23   and social development." Some of these training sessions are preformed jointly with

24   Bumble Bee.

25       185.    FCF stated that it leverages connections with island nations and local

26   fishery authorities to "provide legal and environmental consulting services to fishing

27   vessels to expand business opportunities."

28       186.    FCF's Vessel Service and Governance team has worked directly with

vessel owners on labor issues. The VSG team specializes in supporting vessels for provision services, logistical supervision, social audit scheduling, due diligence checks, and compliance, among other services.  As discussed below, Bumble Bee has been an active participant in some of these programs.

187.   FCF has supplied vessels with access to crews and other logistics.

188.   FCF has also assisted vessels with crew member immigration and logistics.

189.   For example, an FCF subsidiary provided a letter to the Singaporean Immigration authorities detailing the names of the crew (including Plaintiff M. Sahrudin), their intended arrival times, and the name of the fishing vessel (in Sahrudin's case, the *Lu Rong Yuan Yu 878*) to facilitate the fishers' travel to the intended vessel.

190.   Singapore authorities also corresponded with the FCF subsidiary regarding specific seamen on the *Lu Rong Yuan Yu 875*, including their names, nationalities and dates of birth.

191.   Raymond Clarke, who holds dual roles at Bumble Bee and FCF, stated that FCF has staff that go down to the vessels and talk to the owners and operators.

192.   Bumble Bee has been an "active participant" in FCF's "Social Responsibility Program," which purports to set crew recruitment, wage and benefits, and health and safety policies and procedures.

193.   Bumble Bee claims to have worked directly with the fleets and vessels that supply Bumble Bee to review their operations and assist with capacity building, including on issues of crew health, safety and livelihood. Bumble Bee has monitored and instructed the vessels in its supply chain, which it refers to as "our fleet."

194.   Bumble Bee has kept track of the vessels in its fleet, and purports to trace the raw material harvested by each vessel the entire way through the supply chain. Bumble Bee has used blockchain technology to track the tuna in its supply chain from the vessel that harvested it through the canning processes. With the information Bumble Bee keeps, it created an online "Trace My Catch" tool, which allows consumers to enter a unique code found on each can of Bumble Bee tuna and learn the identity of the vessels

that harvested the tuna that went into the can.

195.   Bumble Bee has set and closely monitored environmental and sustainability standards for vessels in its fleet.

196.   For traceability purposes, Bumble Bee and FCF have collected data including vessel trip dates, landing weight by species, port of landing, and ocean area fished.

197.   Since 2016, Bumble Bee has been implementing electronic monitoring on vessels in its fleet to ensure compliance with its environmental sustainability standards. For example, Bumble Bee conducted an e-observer trial, which involved installing cameras on vessels. Bumble Bee and FCF paid for the data analysis.

198.   Each of the vessels on which Plaintiffs were forced to labor was owned by members of the trusted network of boat owners during the relevant time.

199.   The *Lu Rong Yuan Yu 878*, on which Plaintiffs Angga and Muhammad Sahrudin were forced to labor, was owned at all relevant times by Rongcheng City Rongyuan Fishery Co., Ltd. [hereinafter "Rongcheng City"].

200.   The *Lu Rong Yuan Yu 211*, on which Plaintiff Muhammad Syafi'i was forced to labor, was owned at all relevant times by Rongcheng Ocean Fishery Co., Ltd. [hereinafter "Rongcheng Ocean"].

201.   The *Run Da 5*, on which Plaintiff Akhmad was forced to labor, was also owned at all relevant times by Rongcheng Ocean.

202.   Rongcheng City and Rongcheng Ocean were, during all relevant times, participants in the trusted network, relying on FCF for necessary services and supplies, including transshipment and logistics support.

203.   The vessels owned by Rongcheng City and Rongcheng Ocean (including the *Lu Rong Yuan Yu 878, Lu Rong Yuan Yu 211* and *Run Da 5*) were part of the trusted fleet and supplied tuna to Bumble Bee.

204.   During the relevant time, albacore tuna harvested by Rongcheng City vessels, including the *Lu Rong Yuan Yu 878,* was processed and packaged into Bumble

Bee-branded cans and sold to retailers in the United States.

205.    The *Lu Rong Yuan Yu 878* used a transshipment vessel that also transshipped with three other fishing vessels known to supply Bumble Bee.

206.    The *Lu Rong Yuan Yu 878* supplied albacore tuna exclusively to Bumble Bee.

207.    At least six vessels owned by Rongcheng City, including the *Lu Rong Yuan Yu 878*, participated in Bumble Bee's Fisheries Improvement Project (also known as a "FIP," see paragraphs 218 to 238).

208.    During the relevant time, albacore tuna harvested by the Rongcheng Ocean vessels, including the *Lu Rong Yuan Yu 211* and, on information and belief, the *Run Da 5,* was processed and packaged into Bumble Bee-branded cans and sold to retailers in the United States.

209.    During the relevant period, the *Run Da 5* was fishing in the same area of the South Pacific Ocean as the *Lu Rong Yuan Yu 211*.

210.    During the relevant period, the *Run Da 5* used two different carriers for its transshipment, both of which also served vessels in Bumble Bee's Fisheries Improvement Project (in FIP 11122). The Run Da 5 transshipped only with these two vessels during the relevant period.

211.    For example, on January 6, 2023, the *Run Da 5* transshipped with the *Ping Tai Rong Leng 1*. The next day, the *Ping Tai Rong Leng 1* transshipped with the *Lu Rong Yuan Yu 686*, which is also owned by Rongcheng Ocean and is part of the FIP 11122 fleet. The *Lu Rong Yuan Yu 211* (which is also owned by Rongcheng Ocean and part of the FIP 11122 fleet) also transshipped with the *Ping Tai Rong Leng 1*.

212.    In addition, the *Run Da 5* transshipped with the *Ping Tai Rong Leng 2*. The *Ping Tai Rong Leng 2* also transshipped with 33 other fishing vessels that supply tuna to Bumble Bee that is sold in the United States.

213.    The transshipment vessels that picked up the catch from the *Run Da 5* are owned by Pingtairong Ocean Fishery Group Co. Ltd. which also owns at least six

fishing vessels that exclusively supply Bumble Bee in FIP 11122.

214. In addition to the *Ping Tai Rong Leng 1,* the *Lu Rong Yuan Yu 211* rendezvoused with two other transhippers. These two transshipment vessels also collected albacore from 18 other vessels that supply tuna to Bumble Bee for sale in the United States.

215. The *Lu Rong Yuan Yu 211* and, on information and belief, the *Run Da 5* supplied albacore tuna exclusively to Bumble Bee.

216. At least 35 vessels owned by Rongcheng Ocean, including the *Lu Rong Yuan Yu 211,* and, on information and belief, the *Run Da 5,* participated in Bumble Bee's Fisheries Improvement Projects.

217. Since at least 2018, Bumble Bee and FCF have collaborated with Rongcheng City and Rongcheng Ocean to obtain environmental certifications from the Marine Stewardship Council ("MSC").

218. MSC certification or participation in a Fishery Improvement Project are considered to be a competitive advantage, if not a necessity, in the marketplace. Obtaining MSC certification helps participants preserve market access to the increasing proportion of retail buyers who prioritize certifications. Research has shown that the MSC certification also increases the price consumers are willing to pay for a can of albacore tuna.

219. A Fishery Improvement Project or "FIP" is a collaboration between participants to obtain MSC certification.

220. Participation in a FIP requires an investment, financial and in terms of time and effort, by the participants.

221. A sponsor, such as a seafood brand, can propose the creation of a FIP to the MSC by setting forth goals, strategies, and procedures to be followed by FIP participants. If the MSC accepts the FIP proposal, the FIP's sponsor(s) have five years to achieve the FIP's goals, at which point seafood products harvested within the FIP are eligible to be marketed with an MSC certification.

222.    FIP 11122 is an MSC Fishery Improvement Project managed and financed by Bumble Bee and FCF in the South Pacific Ocean during the relevant time.

223.    FIP 12226 is an MSC Fishery Improvement Project managed and financed by Bumble Bee and FCF in the Indian Ocean during the relevant times.

224.    Each FIP has a dedicated fleet of longliner vessels that harvest tuna exclusively for sale to Bumble Bee via FCF. FCF and Bumble Bee are the exclusive buyers of albacore tuna caught by the vessels that participate in their FIPs.

225.    Vessels that elect to participate in a FIP are required to abide by the policies and procedures set by the FIP sponsors.

226.    As part of each FIP, Bumble Bee has set and enforced fishing practices and strategies meant to increase the sustainability of the fishery, which vessels participating in the FIP are required to abide by. For example, Bumble Bee and FCF instructed vessels in FIP 11122 on policies regarding the specific logbooks to be used to track discards (fish that is returned to the ocean typically dead or dying); the proper procedures for setting "bird scaring lines"; and development of garbage management plans.

227.    Bumble Bee and FCF provided trainings and inspections to ensure the vessels within its FIPs implemented and complied with the policies they set. For example, in 2020, FCF collaborated with Bumble Bee on a workshop for vessel owners that covered safe handling of bycatch, use of wide circle hooks, use of longer drop lines to avoid surface species, use of fin-fish bait rather than squid to reduce hooking sea turtles, and use of line weighting.

228.    Bumble Bee has monitored the participating vessels to ensure compliance with the FIP requirements, including through audits and electronic monitoring, among other means, and by tracing each vessel and their harvests.

229.    FCF has audited the vessels, a process that includes office documentation reviews and on-site vessel monitoring.

230.    FCF publicly reported that a 2019 audit of a sample of "our" longline

40

vessel owners and vessels in the Indian Ocean showed that the crew members were predominantly Indonesian.

231.   FCF also tracked the number of crew members on the vessels in the FIPs.

232.   Bumble Bee has financed and managed MSC FIPs because there is demand in its customer base for certified canned albacore tuna.

233.   During the relevant time, Rongcheng Ocean has been a participant in FIP 11122 with Bumble Bee.

234.   During the relevant time and as part of FIP 11122, the *Lu Rong Yuan Yu 211* and, on information and belief, the *Run Da 5,* harvested albacore tuna exclusively for sale to Bumble Bee.

235.   As part of its participation in the FIP 11122 fleet, the *Lu Rong Yuan Yu 211* and, on information and belief, the *Run Da 5,* was subject to the standards and policies set by Bumble Bee for vessels in FIP 11122.

236.   During the relevant time, Rongcheng City has been a participant in FIP 12226 with Bumble Bee.

237.   During the relevant time and as part of FIP 12226, the *Lu Rong Yuan Yu 878* harvested albacore tuna exclusively for sale to Bumble Bee.

238.   As part of its participation in the FIP 12226 fleet, the *Lu Rong Yuan Yu 878* was subject to the standards and policies set by Bumble Bee for vessels in FIP 12226.

**Bumble Bee Lags Behind Industry Standards**

239.   In 2019, the Seafood Stewardship Index released scores and rankings for major international seafood corporations on "human rights and working conditions." It assigned Bumble Bee a score of 0.36 out of 5, which ranked 22nd out of the 30 companies assessed – close to the bottom of the rankings. It assigned FCF a score of 0.46, which ranked 20th.

240.   By comparison, Thai Union Group, which owns Bumble Bee's competitor Chicken of the Sea was ranked 2nd, while Dongwon Group, which owns Starkist, was

41

ranked 6th.

241.    Greenpeace entities have repeatedly urged Bumble Bee to adopt specific measures to bring its human rights policy into conformance with international standards. For example, in its "Fake My Catch" report, Greenpeace East Asia (Taipei Office) urged Bumble Bee to adopt a policy banning recruitment fees and deposits, in line with ILO Convention 188, and to phase out the use of transshipments. Greenpeace East Asia (Taipei Office) made similar recommendations to FCF in its "Choppy Waters" report.

242.    Bumble Bee has not taken these steps.

243.    By contrast, as early as 2015, Thai Union, which owns Chicken of the Sea, restricted the use of transshipment to protect against labor abuses by its suppliers, and in 2017 it instituted a policy banning recruitment fees in its supply chain.

244.    Nestle, the world's largest food company, also "aim[s] to ensure that none of [its] seafood purchases" are sourced from vessels that use transshipment.

245.    Bumble Bee successfully lobbied against a proposed National Oceanic and Atmospheric Administration (NOAA) regulation implementing provisions of the Illegal, Unreported, and Unregulated Fishing Enforcement Act that would have addressed forced labor.

246.    Bumble Bee's former Chief Operating Officer, J. Douglas Hines stated that he resigned from Bumble Bee in 2017 after becoming disillusioned with the tuna industry, in part because he was aware of fishing fleets relying on forced labor.

247.    In 2020, FCF published a Company Update acknowledging that an audit of its fleet had found that recruitment fees and repatriation deposits were being charged, claiming it "was a widespread industry issue."

248.    In 2021, a Bumble Bee executive conceded Bumble Bee had "more work to do" and that FCF "had just started down this path" of putting social standards and policies in place.

249.    As part of its settlement with Global Labor Justice over GLJ's D.C.

Consumers Protection Procedures Act claims, Bumble Bee is prohibited from claiming in its marketing materials that its tuna products are produced through a "fair and safe supply chain" and "fair and responsible working conditions."

250.    As part of the Bumble Bee/FCF Fishery Improvement Project, the two FIPs submitted a "Self-Evaluation of Risk Criteria" focused on human trafficking and forced labor. The Bumble Bee/FCF FIPs answered "YES" to each of three risk criteria:

- There is at -sea transshipment of product and/or fishers among large vessels in the FIP: YES

- The FIP has one or more vessels with a significant foreign migrant workforce (defined as 25% or more of fishers are not citizens of the vessel's flag state): YES

- The FIP has one or more vessels where fishers are not allowed on shore at least once every 90 days: YES.

251.    The FIP's answer to the last question, The fishery has a known instance of forced labor, child labor, or human trafficking within the past four years, was "NOT SURE."

**Bumble Bee's Practices Prevent Plaintiffs from Earning a Good Income at Sea**

252.    Bumble Bee's practices have caused Plaintiffs ongoing harm and limited their employment opportunities.

253.    Commercial fishing is an important and lucrative sector of the Indonesian economy that provides employment opportunities for men in the regions of Indonesia where Plaintiffs reside. Particularly for men with less than a high school education, work in the commercial fishing industry is one of the few avenues that can provide wages sufficient to support a family.

254.    Each Plaintiff would seek to take advantage of these opportunities again but each one fears that if he signed up to work in commercial fishing again he would suffer the same injuries and be trapped in forced labor.

255.    Approximately half of the Bumble Bee FIP vessels are Chinese and half are Taiwanese. Almost all of the Taiwanese tuna fleet is longline and that fleet is almost entirely staffed by Indonesian migrants. The largest number of Indonesian fishers,

43

however, work on Chinese vessels. As one industry expert put it, if you are an Indonesian fisher, you are very likely to be placed on a Chinese vessel. Based on Plaintiffs' experience in longline fishing and the employment options for migrant fishers, they will most likely be placed by recruiting agents on longline vessels in the Chinese or Taiwanese fleet. According to available supply chain data, the vast majority of albacore tuna purchased by Bumble Bee is purchased from those fleets.

256.    Bumble Bee's size and influence in the tuna market means that its policies and practices, including the standards it requires of its suppliers have widespread impact on East Asia's longliner fleets. One industry expert estimated that nearly every longliner vessel will at some point catch tuna for sale to FCF/Bumble Bee.

257.    Plaintiffs desire (and have desired) the opportunity to earn a good wage working in the distant-water fishing industry under safe and fair working conditions, without the risk of being subjected to forced labor at sea. But given their experiences, Bumble Bee's continued reliance on practices that contribute to forced labor, and Bumble Bee's failure to improve conditions on the vessels that supply it, Plaintiffs do not believe they are able to safely return to sea.

258.    Thus, Plaintiffs have foregone employment as a result of Bumble Bee's conduct.

259.    The court can redress this harm by ordering Bumble Bee to change its practices, including, specifically, by ordering the measures described in Paragraph 288. If the court ordered the requested relief, Plaintiffs would take advantage of economic opportunities that are otherwise unavailable.

260.    As described above, in Paragraphs 239-244, Bumble Bee lags behind industry standards.  Its competitors have taken steps to, among other measures, restrict transshipment and ban recruitment fees, demonstrating that Plaintiffs' requested relief is reasonable and feasible.

261.    Plaintiffs would accordingly work again in distant-water fishing if Bumble Bee was ordered to ban the use by vessels in their supply chain of manning

agencies that charge fishers any fees or hold collateral; ensure all workers are paid in full at least monthly; provide a mechanism for past worker-paid fees and unpaid wages to be remediated; ban transshipment-at-sea; require vessels return to port every three months and allow fishers at least 10 days of paid shore leave and unfettered access to port services every three months; ensure fishing vessels carry appropriate medical equipment and supplies, have at least one fisher on board qualified and trained to render first aid, and permit timely medical treatment on shore when necessary; require fishers ten minimum rest hours in any 24-hour period and 77 minimum rest hours in any seven-day period; and require each vessel to be equipped with free, accessible, and secure wi-fi to allow fishers to access grievance mechanisms, authorities, or other sources of assistance.

## CAUSES OF ACTION

### COUNT I

*Violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA")*

*18 U.S.C. §§ 1589, 1595*

262.   Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth here.

263.   Defendant Bumble Bee participated in a venture with FCF, Rongcheng City (the owner of the vessel *Lu Rong Yu 878*) and Rongcheng Ocean (the owner of vessels *Lu Rong Yu 211* and *Run Da 5*) as described above, including in paragraphs 147 to 238. The venture participants all shared the goal of harvesting tuna for sale to consumers in the U.S. market and of maximizing their profit.

264.   Defendant Bumble Bee knowingly benefitted or attempted to benefit from participation in a venture which Defendant knew or should have known was engaged in an act in violation of 18 U.S.C. § 1589 (as alleged above including in paragraphs 36 to 95, 96 to 144 and 171 to 173.

265.   Defendant Bumble Bee knowingly benefitted or attempted to benefit from

1    participation in a venture which engaged in the providing or obtaining of labor or

2    services by the means described herein (including in paragraphs 36 to 95, 96 to 144,

3    and 171 to 173), though it knew, should have known, or was in reckless disregard of

4    the fact that the venture has engaged in the providing or obtaining of labor or services

5    by any of such means.

6        266.  Plaintiffs' labor was knowingly obtained by force, threats of force,

7    physical restraint, or threats of physical restraint to themselves and other fishers on the

8    vessel. All Plaintiffs were isolated at sea, without any ability to leave the vessels. The

9    transshipment provided by FCF ensured that the vessels could stay at sea for extended

10   periods without calling at port, leaving the men without the ability to escape or find help

11   on shore. In addition, all Plaintiffs were subject to force and physical abuse including

12   by being beaten, stabbed, and/or lashed, and also witnessed others being beaten,

13   stabbed, or subjected to other physical abuse, as described above including in

14   paragraphs 8 to 11, 100, 105, 116 to 118, 126 to 129, 138, and 142 to 143.

15       267.  Plaintiffs' labor was knowingly obtained by means of serious harm; threats

16   of serious harm to themselves or their families; the abuse or threatened abuse of law or

17   legal process; by means of a scheme, plan, or pattern intended to cause each Plaintiff to

18   believe that, if he did not labor on the fishing vessel he or his family would suffer serious

19   harm, as described above including in paragraphs 98, 105, 109 to 111, 123 to 125 and

20   133. All Plaintiffs were subjected to a wage withholding scheme, deductions, penalties

21   and fees; the scheme was designed to leave them with little or no wages for their hard

22   work if they left the vessel before the end of the contract period. Indeed, Plaintiffs

23   Angga and M. Sahrudin did not receive any pay for their work at sea. In addition, the

24   families of Plaintiffs Akhmad, Angga, and Sahrudin faced financial penalties and other

25   punishment, including possible prosecution, if the men left early.

26       268.  In addition to the beatings, long hours, hard labor, and harsh conditions,

27   all Plaintiffs were deprived of adequate food, and Plaintiffs Akhmad and Syafi'i were

28   deprived of adequate medical care. This contributed to the climate of fear. Plaintiffs

were especially vulnerable because they were migrants working for long periods of time in isolation on the high seas, without any ability to leave the vessels on which they were being forced to labor or to contact authorities or seek services that might provide them aid.

269.    Defendant Bumble Bee knowingly received or attempted to receive financial and other benefit from the sale of tuna harvested with forced labor, including profits from those sales and access to a steady supply of tuna from its trusted fleet, as well as other benefits as alleged in above including in paragraphs 171 to 173, 218 and 232.

270.    As a result of the conduct of Defendant and its agents, Plaintiffs have suffered damages in an amount to be determined at trial.

271.    Plaintiffs are entitled to recover damages and reasonable attorneys' fees for the wrongful conduct of Defendant and its agents.

272.    Plaintiffs continue to suffer harm as a result of Defendant's actions.

## COUNT II

*Negligence*

*Calif. Civ. Code § 1714*

273.    Plaintiffs reallege and incorporate by reference the allegations set forth above as if fully set forth here.

274.    Defendant Bumble Bee had a duty to use ordinary care to prevent others from being injured as a result of its conduct.

275.    Defendant Bumble Bee failed to exercise ordinary care in its conduct. Specifically, Bumble Bee sourced albacore tuna from vessels on which it knew or should have known fishers, such as Plaintiffs, were at a high risk of forced labor, human trafficking, debt bondage, and other human-rights and labor abuses without putting adequate policies and effective practices in place to prevent or mitigate the risk of such abuses.

276.    Bumble Bee's policies and practices fell below the applicable standard of

1    care.

2    277.   Plaintiffs suffered harm including but not limited to physical injuries,

3    emotional distress, loss of liberty, and economic harm.

4    278.   Bumble Bee's failure to exercise ordinary care in its conduct was a

5    substantial factor in causing Plaintiffs' harm.

6    279.   As a result of the conduct of Defendant and its agents, Plaintiffs have

7    suffered damages in an amount to be determined at trial.

8    280.   Plaintiffs continue to suffer harm as a result of Defendant's actions, which

9    prevent Plaintiffs from earning a safe and adequate living as distant-water fishermen.

10                           **PRAYER FOR RELIEF**

11    WHEREFORE, Plaintiffs pray this Court will enter an order:

12    281.   Entering judgment in favor of each of the Plaintiffs on all counts of the

13    Complaint;

14    282.   Awarding each of the Plaintiffs monetary damages, subject to proof and in

15    an amount to be determined at trial, including but not limited to fees and costs paid,

16    debts incurred, and wages promised but not paid;

17    283.   Awarding each of the Plaintiffs consequential damages, including but not

18    limited to the loss of assets and of educational and business opportunities as a result of

19    Defendant's illegal conduct;

20    284.   Awarding each of the Plaintiffs damages for the mental anguish and pain

21    and suffering Plaintiffs experienced as a result of being trafficked and forced to labor

22    against their will;

23    285.   Awarding each of the Plaintiffs damages for the physical harm they

24    suffered and for past and future medical care and other expenses resulting from the

25    physical injuries;

26    286.   Awarding each of the Plaintiffs punitive and exemplary damages;

27    287.   Awarding Plaintiffs any and all other damages allowed by law according

28    to proof to be determined at time of trial in this matter;

288.   Granting each of the Plaintiffs equitable relief, including but not limited to requiring Defendant to implement, monitor (reporting the result), and enforce effective policies that:

a)   Ensure its venture partners do not utilize manning agencies that charge fishers any fees, including recruitment fees, guarantee fees or other penalties for terminating a contract, or hold collateral;

b)   Ensure all workers are paid in full at least monthly;

c)   Provide a mechanism for past worker-paid fees and unpaid wages to be remediated;

d)   Ensure its venture partners do not engage in transshipment-at-sea;

e)   Ensure its venture partners provide that vessels return to port every three months (or less, if required by national law) and allow fishers at least 10 days of paid shore leave and unfettered access to port services every three months;

f)   Ensure fishing vessels carry appropriate medical equipment and supplies, have at least one fisher on board qualified and trained to render first aid, and permit timely medical treatment on shore when necessary;

g)   Ensure its venture partners provide fishers ten minimum rest hours in any 24-hour period and 77 minimum rest hours in any seven-day period, as required by ILO Convention No. 188 Art. 14(1)(b), except in limited emergency circumstances as allowed by ILO Convention No. 188 Art. 14(4);

h)   Ensure its venture partners to equip each vessel with free, accessible, and secure WiFi to allow fishers to access grievance mechanisms, authorities, or other sources of assistance;

i)   Enjoining Defendant from benefitting from tuna harvested without such protections in place.

49

289.   Awarding Plaintiffs reasonable attorneys' fees and costs;

290.   Awarding such other relief as the Court deems just and equitable.

### JURY DEMAND

291.   Plaintiffs respectfully demand a trial by jury of all issues for which they have a right to demand a trial by jury.

Respectfully submitted,

Dated: December 3, 2025

*/s/ Agnieszka Fryszman*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Agnieszka Fryszman [DC Bar No. 459208]
*pro hac vice*
Nicholas J. Jacques [DC Bar No. 1673121]
*pro hac vice*
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Telephone: (202) 408-4600

**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES, LLP**
Helen I. Zeldes, Esq. [CA Bar No. 220051]
*hzeldes@sshhzlaw.com*
Aya Dardari [CA Bar No. 344039]
*adardari@sshhzlaw.com*
501 West Broadway, Suite 800
San Diego, California 92101
Telephone: (619) 400-4990

Paul L. Hoffman [CA Bar No. 071244]
200 Pier Ave., Suite 226
Hermosa Beach, CA 90254
Telephone: (424) 297-0114

**GREENPEACE, INC.**
Marco Simons [CA Bar No. 237314]
Asia Arminio [DC Bar No. 99607]
*pro hac vice*
1300 Eye Street NW, Suite 1100
Washington, DC 20005
Telephone: (202) 462-1177

*Attorneys for Plaintiffs*

First Amended Complaint
Case No. 3:25-cv-00583-BAS-DEB